# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* D GACH, Minor.

FOR PUBLICATION
April 19, 2016
9:00 a.m.

No. 328714
Livingston Circuit Court
Family Division
LC No. 14-014797-NA

Before: BOONSTRA, P.J., and WILDER and METER, JJ.

BOONSTRA, P.J.

Respondent appeals by right the trial court's July 23, 2015 order terminating her parental rights to the minor child, DG, under MCL 712A.19b(3)(g) (failure to provide proper care and custody), (i) (parental rights to a sibling of the child have been terminated over abuse or neglect), (j) (child will likely be harmed if returned), and (*l*) (rights to another child were terminated under the juvenile code). We reverse and remand for further proceedings.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Respondent is the mother of DG.[1] This case arose when DG, at the time three years old, was found wandering outdoors while unsupervised and wearing a diaper and a T-shirt. The initial petition included the following allegations:

> A referral was received on 8/02/2014 alleging minor child [DG] was found outside around noon in the neighbor's front yard and his front yard in just a t-shirt and diaper with 2 dogs. He was also at the park across the street playing. His diaper was soaked with urine and feces seeping out onto his legs. No one was around, supervising the child. The police were contacted and when they arrived at [respondent's home] no one responded. The police were yelling and banging on the doors. The garage door to the home was unlocked and appears to be the door that [DG] got out of. The police went inside yelling, screaming, and banging in the home for a few minutes before respondent . . . and [MC] (half sister . . . ) finally got up and came downstairs. There was no one else in the home. . . . The

---

[1] The child's father was not identified and was not a part of the proceedings below.

-1-

home was dirty, all of the carpet has been removed, and floor boards are exposed. The couch has a huge rip in it . . . . There is dirt and grime all in the home.

The petition further recited that respondent "has three prior terminations through Wayne County . . ." and additionally reported that a child of respondent's had died in 2001 with suspicious injuries, and that as a result of this suspicious death "[t]he father, Jose Baker was convicted and sentenced to prison,"[2] and respondent "was charged with Felony Homicide but not convicted." The initial petition requested termination of respondent's parental rights to DG.

The trial court authorized the petition on August 5, 2014, placed DG in a non-relative foster home, and ordered that parenting time be suspended. On November 7, 2014, respondent pleaded to the trial court's jurisdiction. Due to a series of delays, the termination hearing was not held until February 3, 2015, and did not conclude until July 23, 2015. Respondent received no parenting time with DG during this span of time.

At the termination hearing, respondent testified that Baker was the father of three of her five children, including the one who had died and two of the three to which her parental rights had been terminated. Respondent testified that Baker was not the father of DG, and that DG had been conceived after a one-time sexual encounter. Respondent further testified that Baker had pleaded guilty in connection with the death of their minor child and began a term of incarceration in 2007, although she insisted that the child "was not killed," but rather "died from neubronchial [sic] pneumonia." Respondent testified that she had not seen Baker since she had visited him while he was incarcerated prior to learning that she was pregnant with DG; i.e., for at least 4 years. Respondent denied that Baker knew where she lived, and testified that she had no intention of contacting him and that she believed he posed a risk to her children. Respondent further testified that she had served as a court-appointed guardian to her juvenile nephew from when he was aged 14 until he moved out in 2012 or 2013 at the age of 19. Respondent's nephew confirmed this testimony, and additionally testified that he had not seen Baker, or heard respondent speak of him, while living with her.

Felicity Gach, age 19, testified that she was respondent's daughter (to whom respondent's parental rights had previously been terminated), that she was in daily contact with respondent, and that she had not seen Baker, nor had respondent spoken of him, in the previous year. Kevin Casey, respondent's brother, testified similarly, and additionally opined that DG was well cared for by respondent.

Melinda Chamberlain, the Child Protective Services (CPS) worker who signed the petition requesting termination, testified that when DG was born, her agency concluded that no relationship existed between respondent and Baker and had no concerns warranting further investigation.

---

[2] Jose Baker pleaded guilty to involuntary manslaughter, MCL 750.32, related to an offense dating from 2001, and pleaded guilty to second degree child abuse, MCL 750.136b(3), related to an offense dating from 2000.

Regarding the incident giving rise to the initial petition, James Michael Damman, a special education teacher, testified that on August 2, 2014 he was at West Street Park in Howell with his family. He testified that he saw a little boy, between two and three years old, wearing only a diaper and accompanied by two puppies and no adults. Damman approached the child, who pointed to where he lived. Damman knocked on the door but received no response. Damman observed that his diaper was soiled with feces, that it was running down his legs, and that some had dried on his upper thigh area. After trying and failing to get a response at some neighboring houses, he called the police, who were able to successfully rouse respondent.

Respondent testified that she did not hear DG get up in the morning when he wandered out on his own. She stated that, the night before, after a long day at work, she went to sleep at 1:00 a.m., then arose at 4:00 a.m. in order to assist her daughter with her job, returning home between 6:45 a.m. and 7:00 a.m. "over exhausted." She further testified that DG had had a change of diaper before going to bed the night before, and that he was sometimes "saturated" when he woke up in the morning. She testified that after the police brought DG home, she changed his diaper and talked to DG, who "basically told us that he wanted to be a big boy and let the dogs out." Respondent also testified that, at that time, the carpet in her house had been removed because she was in the process of putting in a new floor in response to some water damage.

MC, a minor, testified that she was the child of Baker and respondent, and that she had been adopted by her maternal grandmother. She testified that, the night before DG was found outside unsupervised, respondent had left the house to help Felicity with her work, leaving MC to babysit DG. She testified that DG did not normally walk around with heavily soiled diapers and was generally clean. She testified that DG had never left the house unsupervised before. Respondent's maternal grandmother testified similarly regarding DG's cleanliness and supervision.

DG's pediatrician testified that respondent was generally current with appointments for DG; although respondent had missed one appointment at 15 months, this was not necessarily "atypical" for patients.

Angela Tisch, a protective services worker with petitioner, testified that she and Chamberlain, accompanied by police, appeared for a check of the home two days after the incident in which DG had been found unsupervised. Tisch testified that respondent took a long time to answer the door, and did not allow them access to the home. Tisch testified that respondent told them that DG was with a friend of the family, and that a friend of the family brought DG home about an hour after they arrived. Tisch testified that respondent told her that she was employed, but would not name her employer, and that she had a medical marijuana card, which she would not produce. Tisch testified that respondent told her that there were five pit bulls living in the home, although Tisch only saw two, which were barking at the front window. Tisch further testified that respondent indicated that she was aware that Baker had been released from prison, and reiterated that she did not believe Baker was responsible for the child's death, which she attributed to "pneumonia" or "something about infantigo on his lip or something." Tisch stated that respondent told them that Baker had been trying to contact her constantly since his release from prison, but Tisch did not remember if respondent stated that she had a relationship of any kind with Baker at the time. Tisch testified that police officers removed DG

from the home because they deemed the environment unsafe. Tisch indicated that this was partially due to respondent's evasive answers and refusal to allow them to view the home.

Chamberlain testified that were it not for the earlier terminations respondent would likely have been offered services in connection with the instant case, and opined that respondent would possibly benefit from services if given an opportunity, but added that her agency was "not allowed" to take that approach "due to state policy." Chamberlain further agreed that but for the earlier terminations there probably would have been no court filing in the instant case, but instead only the provision of services.

The trial court terminated respondent's parental rights, finding that the statutory grounds found in MCL 712A.19b(3)(g), (i), (j), and (*l*) were proven by clear and convincing evidence, and that termination was in DG's best interests. This appeal followed. This Court granted the joint application of the Legal Services Association of Michigan and the Michigan Coalition to End Domestic and Sexual Violence to participate in this appeal as amici curiae and file a brief for the purposes of challenging the constitutionality of MCL 712A.19b(3)(*l*).[3]

## II. STATUTORY GROUNDS FOR TERMINATION

Respondent first argues that the trial court clearly erred in concluding that termination of respondent's parental rights was warranted under MCL 712A.19b(3)(g), (i), or (j). We agree. We review for clear error a trial court's decision that a statutory ground for termination has been proven by clear and convincing evidence. *In re Trejo*, 462 Mich 341, 356-357; 612 NW2d 407 (2000). A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been made. *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989). A reviewing court must defer to the special ability of the trial court to judge the credibility of witnesses. *Id*.

The relevant statutory grounds for termination in this case, apart from statutory ground (3)(*l*), which we will discuss separately, are:

> (g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

> * * *

> (i) Parental rights to 1 or more siblings of the child have been terminated due to serious and chronic neglect or physical or sexual abuse, and prior attempts to rehabilitate the parents have been unsuccessful.

---

[3] *In re D Gach*, unpublished order of the Court of Appeals, entered February 18, 2016 (Docket No. 328714).

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent. [MCL 712A.19(b)(3)(g), (i), and (j).]

## A. MCL 712A.19b(3)(i)

With regard to this ground, the trial court stated that Baker had been convicted of "felony homicide in the death of [DG's half-sibling] at three months of age which resulted in a . . . term in the Michigan Department of Corrections," and that respondent's parental rights to two of her children were thereafter terminated. The trial court further stated that the referee's findings resulting from the previous termination case "provides compelling evidence of respondent mother['s] abysmal child protective history and her contained [sic] failure to protect her children from her domestic partner Jose Baker Sr.," noting the autopsy findings on the child that were "strongly indicative of child abuse and neglect." The court concluded that "the testimony of the respondent mother even in this case here in 2015 supports . . . similar findings even today."

It is undisputed that respondent's parental rights to her children were terminated previously. And a parent may indeed "neglect" a child by failing to protect the child from another abusive adult. However, this statutory subsection also requires that prior attempts at rehabilitation have proved unsuccessful. Thus, the clear language of the statute requires the court to determine the success of prior rehabilitation efforts as of the date of the termination hearing. See *Maxwell v Citizens Ins Co of America*, 245 Mich App 477, 482; 628 NW2d 95 (2001).

In this case, the trial court essentially based its conclusion on Baker's prior abusive conduct, and its conclusion that respondent had some sort of persistent relationship with him and thus had failed to rehabilitate. Although the trial court is in a superior place to judge credibility, *Miller*, 433 Mich at 337, no evidence or testimony was presented at the termination hearing indicating that respondent was currently in any sort of relationship with Baker. Although the trial court may have possessed a level of skepticism based on respondent's behavior in earlier termination cases of maintaining a relationship with Baker after he showed himself to be abusive, the record does not contain evidence of any interaction between Baker and respondent, other than perhaps attempts by Baker to contact respondent, for the past four years. Further, respondent not only denied any relationship with Baker, but testified as to her awareness that a relationship with Baker would put her children at risk. The trial court thus had no evidence upon which to base its conclusion that "prior attempts to rehabilitate" respondent had been "unsuccessful." MCL 712A.19b(3)(i). We therefore conclude that the trial court clearly erred in concluding that termination of respondent's parental rights was warranted under MCL 712A.19b(3)(i).

## B. MCL 712A.19b(3)(g) AND (j)

The bulk of the trial court's reasoning for termination under these two statutory grounds also stemmed from its conclusion that respondent was either currently in a relationship with Baker or would resume a relationship with him in the future. As discussed above, we hold that the trial court clearly erred in this determination.

Apart from the trial court's concern with Baker, the trial court referred to the incident that had given rise to the filing of the petition, i.e., that DG had been found unsupervised in a park with a heavily soiled diaper and accompanied by two pit bull puppies. However, Chamberlain testified that this event, on its own, would have likely resulted in nothing more than an offering of services had it not been for the earlier terminations. Further, several witnesses testified that DG was generally well-supervised and clean and had never before left the house unsupervised. Further, there was no testimony that DG suffered any harm from the incident. We thus conclude that nothing in the record concerning this incident supports the conclusions, by clear and convincing evidence, that harm would come to DG if returned to respondent, MCL 712A.19b(3)(j), or that, although DG may have been "neglected" at the time he was found by Damman, that "no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age" existed, MCL 712A.19b(3)(g).

The trial court additionally expressed concern about the several dogs in the house that appeared to responding police officers to be barking, growling, and aggressive. However, no evidence was presented that the dogs had ever been a danger to anyone. Although respondent received two tickets in connection with her dogs in 2012 and 2013, they were for allowing the dogs to run loose, not for aggressive behavior on the part of the dogs. Respondent's brother testified that the dogs were protective of DG. Further, there is no evidence that DG was left alone with the dogs, other than the incident that prompted the filing of the petition. Respondent admitted that she was aware that DG should not be with the dogs unsupervised. Thus, we conclude that the record does not contain clear and convincing evidence that the presence of multiple dogs in the home represented either a danger to DG or neglect on the part of respondent.

We hold that the trial court clearly erred in finding that termination of respondent's parental rights was warranted under MCL 712A.19b(3)(g), (i), and (j).

### III. MCL 712A.19b(3)(*l*)

Next, respondent and amici argue that MCL 712A.19b(3)(*l*) violates the Due Process clauses of the federal and state constitutions, US Const, Am XIV, § 1; Const 1963, art 1, § 17. We agree. Respondent did not raise this constitutional challenge in the proceedings below. However, the petition filed by petitioner requesting termination did not specify MCL 712A.19b(3)(*l*) as a potential ground for termination; rather, the record indicates that the trial court sua sponte considered this statutory ground. We therefore decline to treat this issue as unpreserved. See MCR 2.517(A)(7); see also *Nuculovic v Hill*, 287 Mich App 58, 63; 783 NW2d 124 (2010). We review a constitutional challenge to a statute de novo. *Dana Corp v Dep't of Treasury*, 267 Mich App 690, 694; 706 NW2d 204 (2005).

MCL 712A.19b(3)(*l*) authorizes termination of parental rights where "[t]he parent's rights to another child were terminated as a result of proceedings under section 2(b) of this chapter or a similar law of another state." There is no question that this statutory ground was proven in the instant case by clear and convincing evidence; respondent's parental rights were previously terminated under the juvenile code (i.e., "section 2(b)"), MCL 712A.1 *et seq.*, on multiple occasions.

By contrast to MCL 712A.19b(3)(i), there is no requirement under statutory ground (3)(*l*) that its application be limited to "serious and chronic neglect or physical or sexual abuse, and prior attempts to rehabilitate the parents have been unsuccessful." Instead, (3)(*l*) essentially allows a trial court to proceed directly to a best-interest determination when it has taken jurisdiction over a child and a respondent has had a previous termination under the juvenile code for any reason. MCL 712A.19b(5) directs that, "[i]f the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." And MCL 722.638(1)(b)(*i*) requires petitioner to submit a petition for authorization upon determining that there is risk of harm to the child and the parent's rights to another child were involuntarily terminated in accord with the law of this state or similar law of other states. Subsection (2) in turn directs that where a parent who is subject to such a petition "is a suspected perpetrator . . . the department shall include a request for termination of parental rights at the initial dispositional hearing . . . ." Taken together, these statutory subsections and MCL 712A.19b(3)(*l*) ensure that a respondent who has received an involuntary termination of his or her rights under the juvenile code, and over whose child the court has assumed jurisdiction, can only retain his or her parental rights if the trial court fails to conclude by a mere preponderance of the evidence that the termination is in the child's best interest. See *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). We hold that this provides constitutionally deficient protection to a respondent's due process interest in raising his or her children.

"It is well established that parents have a significant interest in the companionship, care, custody, and management of their children. This interest has been characterized as an element of 'liberty' to be protected by due process." *In re Brock*, 442 Mich 101, 109; 499 NW2d 752 (1993). In acknowledgment of this interest, the "statutory-grounds stage," which focuses on the liberty interest of the parent, uses "error-reducing procedures, such as the heightened standard of proof of clear and convincing evidence" to prevent the erroneous determination of a fit parent as unfit. *Moss*, 301 Mich App at 86-87. This is because, at this stage of the proceeding, in addition to the parent's liberty interest, the child and parent both "share a vital interest in preventing termination of their natural relationship until the petitioner proves parental unfitness." *Id*. at 87 (quotation marks and citation omitted).

However, the combination of statutory subsections described above operate to instead create a presumption of unfitness of a respondent who has been subjected to a prior termination. The United States Supreme Court has decreed that " 'a statute creating a presumption which operates to deny a fair opportunity to rebut it violates the due process clause of the Fourteenth Amendment.' " *Vlandis v Kline*, 412 US 441, 446; 93 S Ct 2230; 37 L Ed 2d 63 (1973), quoting *Heiner v Donnan*, 285 US 312, 329; 52 S Ct 358; 76 L Ed 772 (1932). As written, MCL 712A.19b(3)(*l*) provides no way to rebut this presumption of unfitness, assuming the fact of the prior involuntary termination.

Perhaps in recognition of these problems, MCL 712A.19b(3)(*l*) has been rarely referenced in published caselaw. In a few cases before this Court, we have affirmed terminations under statutory ground (3)(*l*); but we have never before considered a due process challenge to that statutory subsection. See *In re Gazella*, 264 Mich App 668; 692 NW2d 708 (2005); *In re*

-7-

*Jones*, 286 Mich App 126, 127-128; 777 NW2d 728 (2009); *In re Smith*, 291 Mich App 621; 805 NW2d 234 (2011).

However, during the pendency of this appeal, and filed as supplemental authority by respondent, Justice MCCORMACK concurred in an order denying leave to appeal a decision of this Court to our Supreme Court, and expressed "reservations about using MCL 712A.19b(3)(*l*) as a statutory basis for termination." *In re Jackson,* 498 Mich 943; 872 NW2d 221 (2015). We share many of those reservations, as discussed above. Justice MCCORMACK also noted that other state courts have allowed termination under similar provisions only upon a showing of the parent's continuing lack of fitness. *Id*. at 221-222, citing *In re JL*, 20 Kan App 2d 665, 672-673; 891 P2d 1125 (1995) and *Florida Dep't of Children & Families v FL*, 880 So2d 602, 609 (Fla, 2004). Here, as discussed above, we find no evidence of respondent's continuing unfitness.

In sum, we hold that, in our current statutory scheme, where there has been an earlier termination, if statutory ground (3)(i) does not justify the new termination because it cannot be clearly and convincingly proved that the parent had failed to remedy the earlier abuse or negligence that led to the earlier termination, application of statutory ground (3)(*l*) "disdains present realities in deference to past formalities" and simply "forecloses the determinative issues of competence and care." *Stanley*, 405 US at 657. MCL 712A.19b(3)(*l*) thus fails to comport with due process in light of the fundamental liberty interest at stake. *In re Brock*, 442 Mich at 109.

We note that we are not unsympathetic to the policy concerns raised by the amici, who point out that the presumption in favor of termination that underlies MCL 712A.19b(3)(*l*) imposes special burdens on such victims of domestic violence as respondent. However, because we find that the presumption imposed by statutory ground (3)(*l*) violates the due process protections of the federal and state constitutions in any event, we need not rely on the policy arguments expressed by the amici.

Further, we note that the amici have alternatively provided this Court (as Justice MCCORMACK also noted in *Jackson, supra*) with examples of similar statutory provisions in other jurisdictions, to which courts of those jurisdictions have applied a "saving construction" in order to salvage the constitutionality of the statute. These savings constructions include the addition of a temporal limitation, the determination that the current termination is for the same cause as the prior termination, or the requirement that the trial court determine the respondent's *current* fitness and whether the respondent has successfully ameliorated the issues that led to the earlier termination.[4] However, such a remedy with regard to MCL 712A.19b(3)(*l*) would, in effect, substantially rewrite an unambiguous (although constitutionally deficient) statute. Although the statute at issue in *Rowland v Washtenaw Co Road Com'n*, 477 Mich 197, 208, 213; 731 NW2d 41 (2007), was deemed to pass constitutional muster by our Supreme Court, the Court also cautioned reviewing courts against engrafting provisions onto unambiguous statutory provisions, in order to save them from being held unconstitutional, and against "judicial

---

[4] See, e.g., *In re JL*, 20 Kan App 2d 665, 672-673; 891 P2d 1125 (1995); *In re TTS*, 2015 OK 36, ___; ___ P3d ___ (2015), slip op at 7.

usurpation of legislative power" and the seizing of "the Legislature's amendment powers." See also *McCahan v Brennan*, 492 Mich 730, 733; 822 NW2d 7474 (2012). MCL 712A.19b(3)(*l*) is not ambiguous, and we decline to judicially effect a substantial revision of the statute in order to salvage its constitutionality, because any such revision is properly the province of the Legislature. See *Shirilla v Detroit*, 208 Mich App 434, 443; 528 NW2d 763 (1995).

Because we reverse the trial court's finding that statutory grounds for termination existed, and reverse the order terminating respondent's parental rights, we need not reach respondent's remaining issues.

Reversed and remanded for further proceedings. We do not retain jurisdiction.


/s/ Mark T. Boonstra
/s/ Kurtis T. Wilder