# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* WILLIAMS/MCNEAL, Minors.

UNPUBLISHED
August 9, 2018

No. 341448
Oakland Circuit Court
Family Division
LC No. 2016-845907-NA

Before: RIORDAN, P.J., and K. F. KELLY and BOONSTRA, JJ.

PER CURIAM.

Respondent appeals by right the trial court's orders terminating her parental rights to her minor children, CGW, CSW, and ADM, under MCL 712A.19b(3)(g), (i), (j), and (l). We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

Respondent is the mother of five children; her parental rights to three of the children were the subject of the proceedings below.[1] On August 24, 2016, the Department of Health and Human Services (DHHS) filed a petition asking the trial court to take jurisdiction over the three children shortly after ADM was born. Both ADM and respondent tested positive for marijuana when ADM was born. The petition also alleged that respondent had not had adequate prenatal care until the fifth month of her pregnancy, and noted that her rights to her eldest child had been terminated in 2013. The trial court authorized the petition, removed the children, and ordered supervised parenting time for respondent in early September 2016. Later that month, DHHS filed an amended petition, alleging that respondent had threatened to stab ADM's legal father, Alonzo McNeal,[2] while holding ADM, and had thrown a panful of grease at him. Respondent also threatened to throw ADM down the stairs if McNeal did not return seven dollars that she believed he had stolen from her. This conduct resulted in domestic violence charges and a court

---

[1] Respondent's parental rights to her oldest child, ZW, were terminated before these proceedings. During the proceedings, respondent gave birth to her fifth child, LM. Respondent's parental rights to these children are not at issue in this appeal.

[2] McNeal had completed an acknowledgment of parentage of ADM. However, it was later determined that McNeal was not ADM's biological father, and the court revoked McNeal's acknowledgment of parentage.

order preventing respondent from having contact with McNeal or ADM. The petition sought termination of respondent's parental rights.

While awaiting the disposition of these charges, respondent pleaded guilty to charges involving the fraudulent use of a financial transaction device and served 67 days in jail. Respondent pleaded no-contest to the allegations in the original petition, but not to the allegations of domestic violence, in April 2017.

A termination hearing was held beginning in June 2017. Respondent testified that she used marijuana almost every day of her pregnancy with ADM and did not believe it was harmful; she did not have a medical marijuana card. Respondent had become pregnant again during the course of these proceedings. She testified that she had been forced to quit her job at a thrift store because of her pregnancy.

The hearing continued in September 2017, by which time respondent had given birth to LM. Respondent testified that she was living in a single room in McNeal's grandmother's home, and that, if she was reunited with her children, the five of them would share her bedroom at the grandmother's house. Respondent believed that she could obtain housing for the children within three to six months, despite owing $5,000 in probation fees. Respondent admitted that she had committed a fraudulent financial transaction and domestic violence, and that she had served a jail sentence for domestic violence from March 27, 2017 to June 22, 2017. Respondent had another criminal case pending for resisting and obstructing an officer and domestic violence.

Respondent attended seven out of eight parenting time classes, but did not complete the course. Despite referrals, she had not begun attending counseling services or anger management classes. Respondent repeatedly missed random drug screens and claimed that transportation issues had prevented her from attending the screens. Children's Protective Services (CPS) worker Alyse Yashinsky testified that respondent was difficult to reach, had hung up on her several times, and was often late to appointments.

Lynn Matthjis, the foster care worker for CGW and CSW, testified that those children had been placed with licensed non-relative foster parents. Respondent had only attended 10 parenting time visits out of the 42 offered from the beginning of the proceedings to July 24, 2017. From July 24 to September 21, 2017, respondent had only attended two visits despite being offered weekly visitation. Matthjis testified that CGW appeared to be bonded to respondent, but that CSW did not appear to have any attachment. Respondent did not call to check on the children. Respondent had refused to tell Matthjis where she was living during the proceedings.

Matthjis testified that CGW and CSW were doing well in their placement. The children had originally had speech delays, but they had improved with treatment in the foster home. The foster parents were willing to provide permanent care for the children.

Amy Wright, ADM's foster care worker, testified that ADM had experienced developmental delays, but had reached developmental milestones with the assistance of his foster mother, to whom he was bonded. Respondent had never visited ADM because of the no-contact order in the domestic violence case. Wright also testified that she had referred respondent to

several services that respondent either did not start or did not complete, and that respondent had missed many drug screens. Wright testified that ADM and respondent were not bonded and that the plan for ADM would be adoption through Oakland Family Services, not his current placement, if respondent's rights were terminated.

Respondent was given a psychological evaluation while jailed in May 2017. Sylvie Bourget, the court psychologist, testified that respondent believed that marijuana was not harmful for children or harmful to use while pregnant; she had used marijuana during ADM's pregnancy and was under the influence of marijuana when she gave birth to him. Bourget opined that respondent's decision-making, judgment, and impulse control were severely impaired, and that she no insight into her issues. Bourget opined that it was not reasonable to think that respondent could provide a safe home for the children within a reasonable amount of time. Rather, if respondent was formally diagnosed and medicated, it could take at least a couple of years until she was able to care for her children. Bourget's prognosis for respondent changing her life was "[v]ery poor." Bourget opined that it would be in the children's best interests for respondent's parental rights to be terminated.

The trial court terminated respondent's parental rights to the three children. It noted that respondent was not credible and had "offered self-serving, inconsistent, and veracity-lacking testimony throughout the entirety of these proceedings." The trial court found that respondent would be unable to provide proper care and custody within a reasonable time considering the children's ages, given "her habitual marijuana use, her lack of emotional stability, her lack of willingness to take ownership for her actions, her lack of self-awareness, her lack of appropriate housing, and her inability to appropriately plan for herself, much less others." The trial court also concluded that respondent completely lacked "remedial judgment or decision-making skills." It found that respondent had not established that she could care for the children in the future or protect them from harm because, in addition to her criminality and history of violence, she had no plan for the children's care, she could not maintain long-term employment, she lived in one bedroom of a home shared with McNeal's grandmother (despite a court order not to have contact with McNeal), and she continued to give birth to children while lacking the means and faculties to meet their "basic physical and emotional needs."

In addition, the trial court concluded that termination was proper under both MCL 712A.19b(3)(i) and (l) because respondent had lost her parental rights to her oldest child; the trial court noted that in that case reunification had failed because of respondent's "total lack of compliance or progress on her treatment plan."

Regarding the children's best interests, the trial court found that the children had no bond with respondent and are more bonded with their foster families, noting that respondent had not seen ADM since September 2016 and had only sporadic visits with the other two children. The trial court also noted that respondent had committed domestic violence while holding ADM, had not demonstrated accountability for her behavior, and had denied the need for individual counseling.

The trial court entered two orders terminating respondent's parental rights as described. This appeal followed.

## II. STATUTORY GROUNDS FOR TERMINATION

Respondent argues that the trial court erred by finding that a statutory ground for termination of her parental rights had been proven by clear and convincing evidence. We disagree. This Court reviews for clear error the trial court's determination regarding the statutory grounds for termination. MCR 3.977(K); *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). "A finding of fact is clearly erroneous where the reviewing court is left with a definite and firm conviction that a mistake has been made." *In re Terry*, 240 Mich App 14, 22; 610 NW2d 563 (2000). When reviewing a trial court's findings of fact, this Court affords deference to the special opportunity of the trial court to judge the credibility of the witnesses. *In re Fried*, 266 Mich App 535, 541; 702 NW2d 192 (2005).

The trial court found that statutory grounds for terminating respondent's parental rights to the three children existed under MCL 712A.19b(3)(g), (i), (j), and (l), which permit termination under the following circumstances:

> (g) The parent, without regard to intent, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.[3]

> \* \* \*

> (i) Parental rights to 1 or more siblings of the child have been terminated due to serious and chronic neglect or physical or sexual abuse, and prior attempts to rehabilitate the parents have been unsuccessful.[4]

> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

> \* \* \*

---

[3] Effective June 12, 2018, the Legislature amended MCL 712A.19b(3)(g) to provide: "The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age." MCL 712A.19b(3)(g) as amended by 2018 PA 58.

[4] Effective June 12, 2018, the Legislature amended MCL 712A.19b(3)(i). See 2018 PA 58. Under the new version of the statute, a prior termination involving serious neglect is a statutory ground to terminate rights to a sibling when "the parent has failed to rectify the conditions that led to the prior termination of parental rights." MCL 712A.19b(3)(i) as amended by 2018 PA 58.

(l) The parent's rights to another child were terminated as a result of proceedings under section 2(b) of this chapter or a similar law of another state.[5]

The trial court did not clearly err by concluding that respondent failed to provide proper care or custody for the children and that there is no reasonable expectation that respondent will be able to provide proper care and custody within a reasonable time considering the children's ages, or by concluding that the children would be harmed if they were returned to respondent's home. MCL 712A.19b(3)(g), (j). Respondent used marijuana almost daily during her pregnancy with ADM, and both respondent and ADM tested positive for marijuana at his birth. She did not obtain prenatal care until she was between 20 and 31 weeks pregnant. Respondent only reported for four drug screens between September and November 2016, and afterward she failed to report for any.

Respondent attempts to minimize her decision to use marijuana throughout her pregnancy with ADM by citing *Matter of Baby X*, 97 Mich App 111, 116; 293 NW2d 736 (1980), arguing that ADM never showed symptoms of withdrawal that would indicate that he was harmed by her use of marijuana. In *Baby X*, the newborn suffered from narcotics withdrawal symptoms as a consequence of prenatal maternal drug addiction. In this case, ADM experienced delays as a baby; further, his foster care worker testified that other effects of prenatal marijuana use may not manifest until ADM begins school. The fact that there was no withdrawal in ADM's case similar to the facts of *Baby X* does not demonstrate that the trial court made a mistake when concluding that respondent's marijuana use contributed to her failure to provide proper care and custody for the children.

Respondent also cites a portion of the DHHS Protective Services Manual, 716-7, which provides, in part, "Substance use, alone, is insufficient reason for investigation or confirmation of abuse or neglect of the child." She argues that her marijuana use during pregnancy therefore did not warrant intervention. But respondent ignores another portion of the same section of the manual, which states:

CPS will investigate complaints alleging that a newborn was prenatally exposed to substances when exposure was confirmed through:

• A positive urine screen of the newborn.

• A positive meconium screen or umbilical cord tissue.

We find respondent's arguments concerning the supposed innocuousness of her marijuana use while pregnant with ADM to be unpersuasive. But even if we were persuaded by this argument, the trial court could have found that clear and convincing evidence existed to terminate

_____

[5] This Court found MCL 712A.19b(3)(l) to be unconstitutional in *In re Gach*, 315 Mich App 83, 100-101; 889 NW2d 707 (2016). Effective June 12, 2018, MCL 712A.19b(3)(l) was eliminated, resulting in former subdivision (m) being redesignated as (3)(l) and former subdivision (n) being redesignated as (3)(m). MCL 712A.19b(3) as amended by 2018 PA 58.

respondent's parental rights under MCL 712A.19b(3)(g) and (j) without reference to respondent's marijuana use.

Shortly after this case began, respondent was arrested for domestic violence. Respondent not only threatened McNeal with a knife and threw a pan of grease at him, but she also threatened to throw ADM down the stairs if McNeal did not return money that she thought he had stolen from her. As a result of respondent's actions in that case, the criminal court ordered no contact between her and McNeal or ADM. In addition, respondent had a previous domestic violence case, also with McNeal as the victim, that involved her resisting and obstructing a police officer. At the time of the termination hearing, respondent was living with one of McNeal's relatives, despite the no-contact order.

Respondent failed to maintain steady employment and was homeless at the time of the trial. At the termination hearing, she admitted that she did not have much to offer her children because she was not "stable myself at the moment." One year after her children were taken into protective custody, respondent opined that she would still need to work for three to six months before she could even obtain housing for all of the children. Even if the trial court accepted respondent's optimism concerning her ability to obtain housing as true, it did not clearly err by finding that respondent could not provide the hands-on parenting that her children needed.

Further, Bourget opined that respondent had severely impaired decision-making, judgment, impulse control, and no insight—if respondent was formally diagnosed and medicated, it could take years until she was able to care for her children. Bourget stated that respondent's prognosis was "very poor." The record demonstrates that respondent would make appointments for services such as counseling and then fail to attend those appointments, claiming transportation issues and inconvenient timing. Bourget opined that it was not reasonable to think that respondent could provide a safe home for the children within a reasonable amount of time. The trial court did not clearly err by finding that respondent's inability to make "safe and sound decisions" to protect her "children from future potential harm" demonstrated that she would be unable to provide proper care and custody within a reasonable time considering the children's ages, and that there was a reasonable likelihood the children would be harmed if returned to her care.

Respondent argues that DHHS failed to provide her with services necessary to reunite her with her children. We disagree. Under MCL 712A.19a(2)(c), when a "parent has had rights to the child's siblings involuntarily terminated and the parent has failed to rectify the conditions that led to that termination of parental rights," reasonable efforts to reunite the child and parent need not be made. Nonetheless, respondent was offered services but failed to complete or benefit from them. The trial court noted that respondent could have shown progress with drug screens, but ceased screening after November 2016. DHHS recommended that respondent attend parenting classes, substance abuse, group, and individual counseling, and provided her with

referrals to those services as well as resources for applying for assistance.[6] Respondent made intake appointments in November 2016 and August 2017, but she missed both appointments. She took a parenting class but did not finish it. The trial court found that respondent would not follow through with services even if she were given more time. We are not left with a definite and firm conviction that a mistake was made when the trial court determined that statutory grounds for termination existed under MCL 712A.19b(3)(g) and (j). *In re Terry*, 240 Mich App at 22.

If at least one ground for termination exists, this Court need not consider the additional grounds on which the trial court based its decision. *In re HRC*, 286 Mich App 444, 461; 781 NW2d 105 (2009). We therefore need not consider the trial court's decision regarding the grounds found in MCL 712A.19b(3)(i) and (l).[7]

## III. BEST-INTEREST DETERMINATION

Respondent also argues that the trial court erred when it found that termination of her parental rights was in the best interests of the children. We disagree. This Court reviews for clear error the trial court's determination regarding the child's best interests. MCR 3.977(K); *In re Mason*, 486 Mich at 152.

"[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). The trial court should weigh all the evidence available to it in determining the child's best interests. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). Factors relevant to a determination of the child's best interests include the child's bond to the parent, the parent's compliance with his or her case service plan, the parent's history of visitation with the child, the child's need for permanency, stability, and finality, the advantages of a foster home over the parent's home, and the possibility of adoption. *Id*. at 713-714.

At least a preponderance of the evidence supports the trial court's determination that termination of respondent's parental rights was in the children's best interests. The record demonstrates that respondent shares no bond with CSW or ADM. CSW's father began caring for her when she was approximately four or five months old, and respondent did not see her until she was taken into protective custody a year later. Respondent only sporadically visited with CSW thereafter and testified at trial that she was still getting to know the child. CSW's foster care worker testified that they did not share an attachment. Similarly, because of the no-contact

---

[6] On appeal, respondent argues that she sought assistance with paying for services "to no avail from DHHS." But respondent does not provide any citation to the record regarding this claim. At trial, respondent merely testified that scheduling her own appointments was "kind of hard."

[7] Given this Court's finding of unconstitutionality in *In re Gach*, 315 Mich App 83, 100-101; 889 NW2d 707 (2016), the trial court clearly erred to the extent it relied on MCL 712A.19b(3)(l) as a statutory ground for termination. But the error was harmless in light of our holding regarding the grounds found in MCL 712A.19b(3)(g) and (j).

order in respondent's domestic violence case involving McNeal and ADM, respondent had not seen ADM for nearly a year, since he was about a month old.

Respondent argues that she nevertheless shares a bond with CGW. Although the foster care worker did testify to the presence of some bond, the trial court also heard evidence that CGW was just over two years old when she was taken into protective custody, that respondent visited her only 12 times and that CGW cried during a majority of the visits, and that CGW refers to respondent by her first name and her foster mother as "mommy." The trial court did not clearly err by finding that respondent's few "hour visits over the course of years . . . hardly demonstrate the consistency and appropriateness required of full-time parenting." We find no clear error in the trial court's finding that no bond existed between respondent and the three children.

Respondent also argues that care by her is preferable to foster care for ADM because his foster parents could not make arrangements for permanent custody. As stated, the permanency plan for ADM was adoption through Oakland Family Services, not his current placement. But respondent was not a viable alternative because she had not demonstrated any ability to properly care for ADM. Again, she had no bond with the child, and the foster care worker stated that respondent did not make inquiries to check on him. Respondent was frequently homeless and lived with various relatives and acquaintances during the proceedings, and at the time of the termination hearing lived in one room in McNeal's grandmother's house. She also failed to establish stable employment and she had an unresolved criminal case at the time of termination. It is difficult to see how respondent's care under these conditions would better provide ADM with stability and support than his current foster care placement, even if that placement is not permanent.

Finally, respondent argues that she was making progress because she had signed up for anger management classes, parenting classes, and counseling. The trial court found that respondent would not follow through with services if she were given more time. The record overwhelmingly supports this conclusion. Given that the children were young, had spent much of their lives in foster care, and needed hands-on parenting, the trial court did not clearly err by concluding that the children were in "dire need of permanency, stability, and finality," and that termination of respondent's parental rights was in their best interests.

Affirmed.


/s/ Michael J. Riordan
/s/ Kirsten Frank Kelly
/s/ Mark T. Boonstra