*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* I. M. TILOT, Minor.

UNPUBLISHED
January 19, 2023

No. 361576
Delta Circuit Court
Family Division
LC No. 22-000640-NA

Before: GLEICHER, C.J., and K. F. KELLY and LETICA, JJ.

PER CURIAM.

Respondent appeals as of right the order terminating her parental rights to minor child, IT, under MCL 712A.19b(3)(i) and (j). Because IT is Native American and eligible for membership in the Sault Ste. Marie Tribe of Chippewa Indians (SSMTCI), provisions of the Indian Child Welfare Act (ICWA), 25 USC 1901 *et seq.*, and the Michigan Indian Family Preservation Act (MIFPA), MCL 712B.1 *et seq.*, were triggered. These statutes impose certain requirements for terminating parental rights to an Indian child—such as proof of "active efforts" to prevent the breakup of the family and proof beyond a reasonable doubt that continued parental custody of the child would be likely to harm the child. See *In re England*, 314 Mich App 245, 259; 887 NW2d 10 (2016).[1] Respondent submits that petitioner, the Department of Health and Human Services (DHHS), did not establish the statutory grounds for termination beyond a reasonable doubt and also argues that termination was improper because the active efforts requirement as discussed in *In re JL*, 483 Mich 300; 770 NW2d 853 (2009), was violated. We affirm.

---

[1] A federal en banc majority concluded that certain provisions of the ICWA were unconstitutional, including the provision addressing "active efforts," on the basis that they commandeer state actors. See *Brackeen v Haaland (On Rehearing)*, 994 F 3d 249, 268 (CA 5, 2021), cert gtd ___ US ___; 142 S Ct 1205; 212 L Ed 2d 215 (2022). However, the *In re England* Court, in discussing provisions that are also pertinent to the present appeal, stated that "the relevant provisions of the ICWA and the MIFPA are essentially identical[.]" *In re England*, 314 Mich App at 259. As such, the conclusion in *Brackeen* is of little import because of the application of state law.

## I. BASIC FACTS AND PROCEDURAL HISTORY

Respondent gave birth to her first child, MR, in 2012. Within weeks of her birth, MR suffered extreme and serious physical injuries at the hands of her father. These injuries included a left humerus bone fracture, skull fracture, bilateral brain bleed, cerebral hemorrhaging, and possible rib fracture, and the medical personnel determined that the injuries were sustained through violent force. Respondent was found to have failed to protect MR and to have medically neglected her. Respondent's parental rights to MR were terminated. In 2014, respondent gave birth to AT, whose father was MR's father. In 2016, respondent gave birth to BL. Following both of those births, respondent acknowledged that she was not ready to be a parent. Additionally, it was learned that respondent engaged in substance abuse while pregnant and had mental health issues, including a suicide attempt. Respondent's parental rights to these two children were also terminated.

In March 2022, respondent gave birth to her fourth child, IT. Adoree Killips, a child-protective services (CPS) worker with DHHS, received a referral on March 10, 2022, the day of IT's birth, regarding allegations of "threatened harm, physical abuse, and improper supervision" in regard to respondent and IT. The impetus for the referral was respondent's CPS history of termination of parental rights to her three prior children that included the severe physical injury to MR. Killips sought to determine the services that respondent had participated in and any attempt by respondent to rectify the conditions that brought the first three children into care. It was discovered that respondent had a pattern that included lack of parenting knowledge, substance abuse, and mental health issues.

Killips learned from respondent that she had not participated in any parenting services. Respondent admitted that she had a problem with marijuana, cocaine, and methamphetamine. Indeed, IT had tested positive for "cannabinoids." Respondent advised that she previously participated in outpatient care with Great Lakes Recovery Services and admitted that "it didn't work out." Respondent also told Killips that she had not engaged in mental health services.

Respondent gave birth to IT in a hospital in Green Bay, Wisconsin.[2] And, after the birth, the nursing staff expressed concerns about respondent's ability to parent IT. The nurses reported that respondent prioritized her own sleep over caring for the infant, expressed a fear of harming the infant, and lacked knowledge of how to care for a newborn baby. Respondent called for the nurses to care for the infant every 30 minutes and spent time on her phone or slept instead of tending to her crying baby herself. Respondent also fell asleep with IT in her arms. Killips stated that DHHS made the decision to seek termination of respondent's parental rights to IT because of "her lack of progress since her prior proceedings, as well as current circumstances." The decision to seek termination was made four days after IT's birth.

---

[2] Petitioner's witnesses opined that respondent gave birth in Wisconsin to avoid DHHS involvement. In her testimony, respondent denied that was her motivation. But when asked to state why she gave birth in Green Bay, a place she had never resided, she testified, "I don't know, like, how to explain it." DHHS filed the petition in Delta County, Michigan, the location of respondent's residence.

Despite the decision to seek termination of parental rights, Killips acknowledged that respondent did participate in some services during the approximate two-month period between the filing of the petition and the termination hearing. Respondent advised that she contacted Pregnancy Services of Delta County and began to address parenting skills. However, Killips had received no documentation about respondent's parenting classes, could not determine if respondent made any progress, and the agency did not respond to Killips's request for a progress report.

Concerning substance abuse services, Killips testified that respondent completed a substance abuse evaluation over the phone, and it was recommended that she participate in inpatient services for 30 days at Great Lakes Recovery Center. Respondent failed to successfully complete the program and left within a week of her stay contrary to the professional advice. Respondent reportedly told Killips that she left the facility because she had issues with other residents at the facility, did not like performing assigned chores, and was better suited for outpatient services. Respondent was aware that inpatient treatment was recommended but expressed her preference for outpatient treatment and represented that she had enrolled in this service.[3]

When Killips offered respondent a drug screen on March 28, 2022, she declined because "two days prior she had smoked cocaine." Respondent submitted to a drug screen on April 13, 2022, and it was positive for cocaine. Killips testified that respondent's use of illicit drugs remained a concern and reflected a "lack of progress from the previous cases."

Respondent reported that she was engaged to Isaac Trottier, but he was incarcerated for possession of methamphetamine. She resided in a mobile home occupied by Trottier's brother, Damon Tebear. There were two bedrooms in the home for Tebear and his son, and the third bedroom was locked. When the home was examined for suitability, Tebear was not present to unlock the third bedroom. Respondent paid rent to sleep on the couch. Killips determined that the home was not appropriate for IT because there was no running water and a "Pack 'N Play" that respondent had set up for IT "was filthy with a dried substance on it." Respondent sought housing assistance from the tribe, but her application for tribal housing was incomplete for failing to present Social Security information.

In 2012, Sherry Carpenter conducted the CPS investigation regarding MR, whose father was Scott Raminger. MR was also born "exposed to THC." Approximately three weeks after her birth, MR incurred severe head injuries. The parents were not able to provide a believable explanation for the injuries. Carpenter testified, "I think we ended up substantiating for physical abuse on the father; and in [respondent's] case, it was medical neglect and failure to protect." Consequently, respondent's parental rights to MR were terminated. Services were provided to

---

[3] At the hospital, respondent was given the opportunity to participate in "Early On" services for IT, which would have addressed issues for drug exposed infants, but she refused. The service was designed to provide a benefit to both the infant and the parent. IT began to receive this service when placed in foster care.

respondent in the period between MR's birth and her injuries, although Carpenter could not recall exactly which services without reviewing the case notes.

Carpenter participated in the 2014 investigation regarding AT. AT's father was also Scott Raminger, even though respondent had represented her intent to separate from him. Termination of respondent's parental rights to AT was requested in the initial petition because of the severity of MR's injuries. Carpenter testified that respondent cooperated in the investigation, and that it seemed "she understood that she was, maybe, not in a position to care for the child." Respondent was "agreeable to moving forward with the petition," and her parental rights to AT were terminated. During the investigation, respondent admitted to jumping into traffic in a suicide attempt which led to a hospitalization and diagnosis of bipolar disorder.

Kelly Chandler was the assigned CPS worker for the 2016 investigation involving BL. DHHS was apprised of the two prior terminations and that respondent had tested positive for marijuana throughout her pregnancy with BL. BL had a meconium screen showing a positive result for marijuana. Chandler testified that, at the hospital, respondent admitted that she was not "mentally ready" to care for BL. Respondent indicated that she was still struggling with the death of her father and sought a relative placement for BL. She acknowledged using marijuana to cope with mental health issues, and she failed to participate in parenting classes. Respondent was not upset that DHHS pursued termination of her parental rights to BL. Instead, she expressed that she was thankful that BL would be safe. On the basis of respondent's plea, a termination order was entered regarding BL. But respondent was informed about various services that were available and did receive some referrals.[4]

Heidi Nesberg, a caseworker for the SSMTCI, testified as an expert on ICWA and MIFPA matters. When questioned about services for respondent, Nesberg testified, "The services that have been provided are many. We're looking at a ten-year history here." Nesberg said that MR had been a "drug positive infant" and that "[p]arent aid" and Early On services were provided, but MR was severely physically injured within a couple of weeks of her birth. The tribe was alerted to MR's case, and therefore, respondent received prenatal care and drug screens while pregnant with her second child, AT. Yet, respondent tested positive throughout the pregnancy for marijuana. Nesberg noted that psychiatric care was provided to respondent in connection with the

---

[4] Chandler recalled that a family team meeting was held where all the available services were delineated. Respondent was referred for services including mental health, substance abuse, housing, and transportation. DHHS also provided food and medical assistance and referred BL to Early On services. Chandler also testified that respondent received services from the SSMTCI. DHHS policy was to make a referral to the tribe, and the placement of BL was coordinated through the tribe. Chandler acknowledged that her testimony regarding services was premised on agency policy, and she would need to review the case reports to testify with certainty about the services provided. Additionally, Chandler reviewed the prior termination files and included in the 2016 petition were the services previously provided to respondent. If permitted to review the case report, Chandler would have further detailed those services for the record. Additionally, she would have been required to review the service plans and foster care investigations, but she had no independent recollection without seeing her notes or case files to refresh her memory.

suicide attempt and other mental health issues. With regard to the third child, BL, respondent received services through Pathways and Great Lakes Recovery. In conjunction with all the cases, respondent received "food assistance" and "medical assistance," and the SSMTCI was involved.

Nesberg testified that, in the current case, respondent had a substance abuse assessment and was given a recommendation for inpatient treatment. In addition, respondent participated in outpatient treatment and had been referred to parenting classes. Nesberg noted that respondent "also received a lot of instruction in the hospital in regard to caring for an infant from the nurses and the doctors." Nesberg testified:

> Unfortunately, [respondent] has received a lot of services; but despite—this is a ten-year span. [Respondent] still has not learned to not use marijuana when she's pregnant, and now she's graduated to cocaine and methamphetamine. That is a huge concern. If we had a mom that was—stopped using—every drug test was clean, stayed in drug treatment, we'd be looking at a different situation.

Nesberg opined that active efforts had been exerted to prevent the termination of respondent's parental rights to IT. Nesberg testified that respondent was "still . . . having drug addicted babies," was not participating in recommended inpatient treatment, and tested positive for cocaine "right after she got out of treatment." She concluded that placing IT with respondent would "present a substantial risk" of "harm to [IT's] physical health or mental well-being." She further opined that respondent had not addressed issues dating back to 2012. Because respondent was previously charged with a drug offense, Nesberg was unaware if respondent would qualify for tribal housing and noted there was a year-long waiting list. Nesberg opined that the statutory grounds for termination of respondent's parental rights were established. The tribe supported terminating respondent's parental rights to IT and concluded that it was in IT's best interests to do so. Additionally, IT's guardian ad litem (GAL) supported the termination of respondent's parental rights.[5] In contrast, respondent's counsel disputed whether active efforts were made to prevent removal in light of respondent's decision to decline services and the voluntary relinquishment of rights to AT and BL, and therefore, the statutory grounds to support termination were not established.

The trial court concluded that jurisdiction was appropriate and also found that the statutory grounds for termination had been established beyond a reasonable doubt. The trial court determined that active efforts had been provided in an attempt to keep the family together. With regard to the ground for termination under MCL 712A.19b(3)(i) and its "fail[ure] to rectify" language, the court stated that the prior terminations involved parenting skills, mental health issues, and substance abuse. It noted that the substance abuse issue had not been rectified in light of respondent's recent use of cocaine, admission to using methamphetamine, and departure from the inpatient treatment facility against professional advice. It also stated that respondent refused

---

[5] After petitioner rested as to the jurisdictional portion of the hearing, respondent did not present any witnesses. Instead, respondent presented a letter showing that she had been participating in classes from Pregnancy Services, had been "honest about her situation," and was open to improvement. Petitioner requested that the court take judicial notice of the records of the three prior termination cases.

Early On services at the hospital. Regarding MCL 712A.19b(3)(j), the court stated that respondent was living on a couch in a home that had no running water and noted that the home was unfit for a child. The court again cited to respondent's substance abuse. It concluded that substance abuse had affected respondent's ability to parent prior children and that this "continues to be an issue with [IT] in this case."

Following the findings addressing statutory grounds, testimony was admitted to address IT's best interests. Killips testified that it was in IT's best interests to terminate respondent's parental rights because of respondent's "lack of overall progress over the past ten years, in the specific areas of lack of parenting skills, substance abuse, and mental health, and overall stability." Killips delineated the active efforts that were made with each child to prevent removal and the termination of respondent's parental rights. In 2012, respondent had been offered food and medical assistance through DHHS, income through Social Security, services with a "parent aid," services for a drug exposed infant, services with a nurse as part of a "maternal infant health program," and Early On services. A nurse and hospital staff worked with respondent throughout the pregnancy and after MR's birth.

In AT's case, respondent received an Early On referral, food and medical assistance through DHHS, Social Security income, mental health care, and placement assistance from the SSMTCI. With regard to BL, respondent again received an Early On referral, food and medical assistance, and Social Security income. In addition, there was a discussion about having respondent complete her GED (general educational development) degree and participate in the Healthy Families program, which provided parenting skills classes. As for the current case, Killips testified that respondent was still receiving assistance for food, medical care, and income, received an Early On referral, and began the Pregnancy Services parenting classes. In addition, she received information to obtain the substance abuse evaluation which led to respondent's inpatient treatment.[6] However, respondent left the facility prior to successful completion. Respondent received direct assistance to complete her application for housing through the SSMTCI. Both respondent and IT received support and education from hospital staff during the first five days of IT's life.

Respondent was not granted visitation with IT after the initial removal. He was currently placed in a home with two biological siblings. The foster parents, part of the tribe, were relatives

---

[6] Killips gave respondent a county community resource guide that identified all mental health providers and their services, but respondent only expressed an interest in substance abuse treatment, not mental health services. Killips met with respondent twice to provide the resources guide and recommended mental health services. She also gave respondent a list of drug and alcohol recovery meetings with the location and times. Although termination of respondent's parental rights was the goal, Killips engaged with respondent regarding the type of services needed and their availability. And although services were not required when termination of parental rights was sought, Killips still advised and encouraged respondent regarding services because "we want her to do better and be better."

and had adopted these two siblings; they were willing to adopt IT as well.[7] IT was receiving Early On services in foster care and was safe there. Despite the relative placement, Killips did not recommend a guardianship but termination of parental rights. In a guardianship, there was the potential for harm if IT was returned to respondent's care. IT needed permanency and stability in light of his infancy and the potential adoption. It was opined that respondent could not provide permanence, stability, and safety to IT because of her instability for the last ten years, her lack of progress,[8] and her lack of initiative until after IT's birth. Indeed, respondent's substance abuse only increased over the last ten years. Because of respondent's limited contact with IT, Killips did not have an opinion regarding any bond between the two.

When recalled as an expert witness, Nesberg again testified that the active efforts that occurred considered the tribal interest and cultural considerations. Nonetheless, Nesberg and the tribe supported termination despite the relative placement. The issue had been presented to the Child Welfare Committee of the tribe. Nesberg stated that the tribe looked to guardianship with relatives as an option primarily for older children who had a strong bond with the biological parent, not infants. Nesberg acknowledged that she did not personally observe respondent with IT. But, Nesberg was given notes from the hospital nurses about respondent's parenting actions. The nurses reported that respondent asked them to care for IT on multiple occasions to allow her to rest. Instead, respondent opted to play on her telephone, watch television, or otherwise relax. One evening, IT cried aggressively but respondent refused to comfort him. When the nurses came into the room, respondent simply said, "If you need me, let me know," and went to sleep. Nesberg acknowledged that there was a putative father. Regardless of whether a legal father came forward, Nesberg and the tribe concluded that it was in IT's best interest to have respondent's parental rights terminated.

Respondent testified that she addressed the issues that caused the prior terminations of her parental rights. She went to AA (alcoholics anonymous) or NA (narcotics anonymous) meetings almost every night, attended weekly parenting classes,[9] and submitted to drug screens. Respondent said that the April 13, 2022 drug screen must have been a "false positive[]" because she had not used cocaine or any other drug since March 28, 2022. The period between March 28, 2022, and May 10, 2022, the date of the hearing, was respondent's longest period of sobriety since 2012. Respondent testified, "I feel that I don't need the drugs in my life, and that I'm capable of taking care of my son." She acknowledged that she left inpatient treatment because of her inability to get

---

[7] At that time in the proceedings, a putative father of IT was identified, and he chose to undergo genetic testing to determine paternity. Killips acknowledged that adoption was speculative until paternity was established and whether the putative father, if determined to be the legal father, sought custody.

[8] Hospital staff expressed concern regarding respondent's capacity to obtain parenting knowledge. Respondent told hospital staff that she was unaware that babies did not sleep through the night and she went to sleep with the baby in her arms contrary to safe sleep practices.

[9] Respondent could not recall if she participated in parenting classes for her other children.

along with other patients but she began weekly outpatient treatment on April 27, 2022. Respondent admitted that she left the inpatient facility against professional advice.

Respondent sought housing through the SSMTCI and needed proof of income to complete the housing application. Her current housing did not recently have running water and was not appropriate for IT. Nonetheless, respondent explained that she could provide a safe home for IT because she had income and did what was best for IT.[10] If IT was returned to respondent, she would seek to stay with the infant at her brother's home until she obtained housing. When asked why she believed that she could keep her substance use under control, she replied, "If I've done it this long, I can do it." Respondent acknowledged her engagement to Trottier and his issues with methamphetamine. Although he was not an appropriate person to be with IT, she believed that he could change. He was scheduled to be released from incarceration in September 2022.

Respondent admitted that she was "not capable of taking care of [her] own money" and that her mother managed her money. When asked in what way she was bonded with IT, she said, "Waking up to him in the middle of the night at the hospital." Respondent denied delegating the care of IT in the hospital and said that the nurses "only watched him twice when they've told me that I could go and take a shower." But she admitted that she fell asleep with IT in her arms.

The trial court concluded that, beyond a reasonable doubt, it was in IT's best interests to terminate respondent's parental rights. It found that active efforts to preserve the family had been expended. It further concluded that respondent did not have appropriate and stable housing even for herself, that respondent was unable to manage her finances, that respondent only spent five days with IT, and that IT had the potential for adoption. The court stated that respondent was only in the initial stages of trying to address issues such as substance abuse and concluded that she would not be able to provide permanency and stability to IT within a reasonable time considering his age. From this determination, respondent appeals.

## II. STANDARDS OF REVIEW

To terminate parental rights, the trial court must initially find, by clear and convincing evidence, a statutory ground for termination, MCL 712A.19b(3), and the appellate court reviews for clear error the trial court's factual findings and its ultimate determination that a statutory ground has been established. *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). In the case of an Indian child, termination requires a finding beyond a reasonable doubt that the child would be harmed if returned to the parent, and this finding, too, is reviewed for clear error. See *In re England*, 314 Mich App at 261, and *In re Beers*, 325 Mich App 653, 680, 683; 926 NW2d 832 (2018). "[A]ny issue regarding the interpretation and application of the relevant federal and state statutory provisions is reviewed de novo." *In re Beers*, 325 Mich App at 680.

To justify termination of parental rights to an Indian child, a petitioner must prove that there had been active efforts to prevent the breakup of the family by clear and convincing evidence, and this Court reviews the trial court's findings regarding active efforts for clear error. *Id.*; *In re*

---

[10] Respondent received approximately $740 in Social Security benefits and paid $150 in rent to stay on the couch at the mobile home. She also received $250 in monthly food stamps.

*England*, 314 Mich App at 260. Even if some evidence supports a factual finding, it is clearly erroneous when the reviewing court is nevertheless left with the firm and definite conviction that the lower court made a mistake. *In re Mason*, 486 Mich at 152. Under the ICWA, the DHHS is required "to undertake a thorough, contemporaneous assessment of the services provided to the parent in the past and the parent's response to those services before seeking to terminate parental rights without having offered additional services." *In re JL*, 483 Mich 300, 305; 770 NW2d 853 (2009). However, the ICWA does not require as a matter of course that DHHS provide services each time a new termination proceeding is brought against a parent. *Id*.

### III. STATUTORY OVERVIEW

The trial court found the following statutory grounds, MCL 712A.19b(3) were established and they state in relevant part:

> The court may terminate a parent's parental rights to a child if the court finds, by clear and convincing evidence, 1 or more of the following:
>
> * * *
>
> (i) Parental rights to 1 or more siblings of the child have been terminated due to serious and chronic neglect or physical or sexual abuse, and the parent has failed to rectify the conditions that led to the prior termination of parental rights.
>
> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent.

The removal of an Indian child is subject to a heightened standard of review, and the petitioner must demonstrate active efforts to provide services designed to prevent the breakup of the family. MCL 712B.15[11] states, in part:

> (2) An Indian child may be removed from a parent or Indian custodian, placed into a foster care placement, or, for an Indian child already taken into protective custody, remain removed from a parent or Indian custodian pending further proceedings, only upon clear and convincing evidence that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family, that the active efforts were unsuccessful, and that the continued custody of the Indian child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the Indian child. The active efforts must take into account the prevailing social and cultural conditions and way of life of the Indian child's tribe. The evidence must include the testimony of at least 1 qualified expert witness, who has knowledge of the child rearing practices of the Indian child's tribe, that the continued custody of

---

[11] Additionally, there was a requirement that a qualified expert witness address tribal customs and practices. MCL 712B.17(1). The parties stipulated that Nesberg qualified as such an expert.

the Indian child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the Indian child.

(3) A party seeking a termination of parental rights to an Indian child under state law must demonstrate to the court's satisfaction that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that the active efforts were unsuccessful.

(4) No termination of parental rights may be ordered in a proceeding described in this section without a determination, supported by evidence beyond a reasonable doubt, including testimony of at least 1 qualified expert witness as described in section 17, that the continued custody of the Indian child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the Indian child.

Finally, MCL 712B.3(a) states:

"Active efforts" means actions to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and to reunify the Indian child with the Indian family. Active efforts require more than a referral to a service without actively engaging the Indian child and family. Active efforts include reasonable efforts as required by title IV-E of the social security act, 42 USC 670 to 679c[.]

MCL 712B.3a(*i*)-(*xii*) identify additional reasonable efforts that constitute active efforts. These include, but are not limited to, engagement of the entire extended Indian family, identification of appropriate services and assistance in overcoming barriers to compliance, assistance in developing a case plan consistent with the Indian community, and completion of an assessment of the situation and determining the likelihood of protecting the Indian child in his home, among many others. *Id*.

IV.  MCL 712A.19b(3)(i)

Respondent contends that the trial court clearly erred in determining that the proofs were satisfied for purposes of MCL 712A.19b(3)(i).  We disagree.

As noted, to terminate parental rights under this subsection, it had to be demonstrated that respondent's parental rights to one or more siblings was terminated due to serious physical abuse, and respondent failed to rectify the conditions that led to the prior termination of parental rights. This subsection requires that the court determine the success of prior rehabilitative efforts as of the date of the termination hearing. *In re Gach*, 315 Mich App 83; 889 NW2d 707 (2016).

Respondent's parental rights to MR were terminated after the three-week old infant suffered serious injuries at the hands of her father. Although respondent was not determined to have engaged in physical abuse, she was substantiated for failure to protect and medical neglect. With respondent's fourth child, IT, caseworkers examined the prior three terminations and acknowledged respondent's patterns. Specifically, it was determined that the failure to protect and medical neglect arose from substance abuse, mental health issues, and lack of parenting skills.

-10-

Respondent failed to stop engaging in substance abuse during her pregnancies and her drug use elevated to more illicit drugs, such as methamphetamine and cocaine. Additionally, after respondent's suicide attempt and diagnosis with bipolar disorder, she did not pursue mental health treatment. Killips, Carpenter, Chandler, and Nesberg all testified regarding the services provided to respondent,[12] any consultation with the tribe, and the tribal position regarding respondent's parental rights. The services included food and medical assistance, parenting classes, mental health treatment, substance abuse treatment, and housing. These services were designed to teach respondent how to care and provide for a child. Despite the provision of services, respondent did not participate in and successfully complete parenting classes and substance abuse treatment. She resided in a home without water that was unsuitable for a child. Respondent was unable to manage her own finances. Although respondent left the father of MR and AT, her current fiancé was incarcerated for a drug offense.[13] Under the circumstances there was clear and convincing evidence to support this ground for termination. DHHS and the tribe attempted to provide services to respondent when she was pregnant to prevent a repetition of harm to her subsequent children. However, respondent did not participate or benefit from this attempt at rehabilitation. Although the trial court did not specifically characterize the prior efforts as "rehabilitation," the trial court noted that respondent failed to participate in recommended services such as inpatient treatment and Early On services. Under the circumstances, we cannot conclude that the trial court clearly erred by finding that the ground for termination under MCL 712A.19b(3)(i) had been proven beyond a reasonable doubt.

## V. MCL 712A.19b(3)(j)

In connection with MCL 712A.19b(3)(j), respondent contends that the trial court failed to make a finding that "the continued custody of the Indian child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the Indian child" in accordance with MCL 712B.15(4) and MCR 3.977(G)(2).[14] The court did not specially state, "In connection with

---

[12] Although respondent challenges the provision of services on appeal in terms of active efforts, these witnesses noted that a review of the case file would provide additional specifics regarding the services provided. However, there was no indication that the attorneys presented the case file to refresh their recollection. Petitioner did request that the trial court take judicial notice of the case files.

[13] Respondent asserted that reversal was warranted in light of *Gach*, 315 Mich App at 94. In *Gach*, this Court reversed the termination of the respondent's parental rights premised on prior abusive conduct and a failure to rehabilitate. The trial court concluded that the respondent was still in a relationship with the abuser when there was no evidence of a current relationship. *Id*. at 94-95. In this case, respondent's relationship with the father and abuser of MR was not the dispositive issue, and her subsequent separation from him did not prevent the termination of her parental rights. Rather, respondent's substance abuse issues, mental health issues, parenting issues, and housing were pervasive, and respondent failed to address these concerns. Respondent's reliance on the *Gach* decision is misplaced.

[14] We note that, in *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011), the Court stated, "Only one statutory ground need be established by clear and convincing evidence to terminate a

-11-

MCL 712A.19b(3)(j) I find that the requirements of MCL 712B.15(4) have been met." But the court's opinion must be read as a whole. The court did not divide its opinion into specifically delineated portions; indeed, at times, the court discussed the two subdivisions at issue— subdivision (i) and subdivision (j)—in conjunction. At one point, the court stated that Nesberg "did testify that continued placement with the parent is likely to result in serious emotional, and physical damage to the child."[15] It is obvious from context that the court was accepting Nesberg's testimony in this regard. The court then went on to state that the ground for termination in MCL 712A.19b(3)(i) had been established, and immediately after that it stated that the ground for termination in MCL 712A.19b(3)(j) had been established. The court stated that there was "a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent." Contrary to respondent's assertion, the court's opinion as a whole shows that the court did make the required findings for an Indian child.

Respondent contends that the trial court's conclusion was contrary to the following portions of 25 CFR 23.121 (2022):

> (c) For a foster-care placement or termination of parental rights, the evidence must show a causal relationship between the particular conditions in the home and the likelihood that continued custody of the child will result in serious emotional or physical damage to the particular child who is the subject of the child-custody proceeding.

> (d) Without a causal relationship identified in paragraph (c) of this section, evidence that shows only the existence of community or family poverty, isolation, single parenthood, custodian age, crowded or inadequate housing, substance abuse, or nonconforming social behavior does not by itself constitute clear and convincing evidence or evidence beyond a reasonable doubt that continued custody is likely to result in serious emotional or physical damage to the child.

Specifically, respondent submits that the evidence showed only single parenthood, inadequate housing, and substance abuse and that the condition that had harmed MR—the violence inflicted by MR's father—had been rectified because respondent was no longer in contact with him. But respondent's parental rights to MR were terminated on the basis of neglect and a failure to protect, and substance abuse constituted part of respondent's issues. This is not a case in which the respondent merely had a problem with substance abuse; it is a case in which the respondent had a problem with substance abuse and a child had incurred extremely severe injuries while in her care. The birth of subsequent children revealed additional mental health issues as well as a lack of parenting knowledge. The court in this case specifically noted that "evidence of the treatment of one child is probative of how the parent may treat the child's siblings." This is an accepted doctrine. See *In re AH*, 245 Mich App 77, 84; 627 NW2d 33 (2001). The effect of the trial court's

---

respondent's parental rights, even if the court erroneously found sufficient evidence under other statutory grounds." We will nevertheless address respondent's arguments regarding subdivision (j).

[15] Nesberg's status as a qualified expert witness was not in dispute.

conclusion was that, in light of past events and current circumstances, IT was likely to incur serious injury in respondent's care. See *In re JL*, 483 Mich at 331-332 ("We also agree that invocation of the doctrine of anticipatory neglect to terminate parental rights solely on the basis of past behavior would be inconsistent with [the beyond-a-reasonable-doubt] standard. Here, however, the evidence concerning respondent's past conduct established that she was an unfit parent in the past, and the current evidence revealed that she continued to make choices that demonstrated a lack of maturity and ability to care for a child."). In light of all the circumstances, we cannot conclude that the trial court clearly erred by making this conclusion, and reversal is unwarranted.

## VI. *IN RE JL*

Respondent next argues that, under *In re JL*, DHHS may not seek termination with regard to an Indian child without making a thorough, contemporaneous assessment of services offered in the past and the parent's response to those services. She contends that DHHS failed to do this and instead quickly filed for termination. We disagree.

In *In re JL*, 483 Mich at 317-318, the Court noted that, under the version of MCL 712A.19a(2)(c) then in effect, DHHS was not required to provide reunification services when the parental rights to a sibling of the child in question had been involuntarily terminated.[16] It stated, however, that the requirement to provide active efforts to prevent the breakup of the family was still required for Indian children, despite that statute. *Id*. at 318. The respondent argued that because DHHS had not provided any current active efforts in connection with the child at issue, but only past active efforts in connection with other children, termination of her parental rights to the child in question had been improper. *Id*. at 319, 324. This Court did not agree and concluded that the past active efforts had been adequate to support the current termination. *Id*. at 319, 335. The Court first stated that the provision of services could not be dispensed with merely on the basis of a summary finding of futility. *Id*. at 325-327. It went on to explain that a more detailed conclusion was required:

> We further note that the DHS's apparent policy of providing no services when a petition for termination of parental rights is based on a prior termination will not withstand the heightened standard of the ICWA. When the proceedings involve an "Indian child" within the meaning of the ICWA, the DHS or the tribe must, even if services have been provided to the parent in the past, conduct a thorough and contemporaneous review of those services and the parent's progress or lack thereof in response to those services. Only if active efforts have been provided to prevent the breakup of the Indian family, and it does not appear that the provision of additional services is likely to prevent the need for termination, may the DHS or the tribe pursue termination without providing additional services. [*Id*. at 327.]

---

[16] MCL 712A.19a(2)(c) currently states that reunification services are not required if "[t]he parent has had rights to the child's siblings involuntarily terminated *and the parent has failed to rectify the conditions that led to that termination of parental rights*." (Emphasis added.)

The Court continued:

> Although they were provided in connection with prior termination proceedings, the services offered to respondent were extensive, relatively recent, and tailored to meet her specific needs. Over several years, caseworkers came to respondent's home. They tried to teach her parenting and financial skills, without success. The evidence demonstrates that these efforts are relevant to the respondent's current situation and abilities. The caseworkers unsuccessfully attempted to address both respondent's poor decision-making and the unsafe conditions her decisions created. As further explained below, [the] respondent's own testimony showed that she continued to make the same poor choices that she made when she was receiving services. The ICWA's "active efforts" requirement has been met. [*Id*. at 330-331.]

Respondent contends on appeal that DHHS failed to provide any current substance abuse counseling before filing the termination petition. But the *In re JL* Court stated, "Only if active efforts have been provided to prevent the breakup of the Indian family, and it does not appear that the provision of additional services is likely to prevent the need for termination, may the DHS or the tribe *pursue termination without providing additional services*." *Id*. at 327 (emphasis added). It is true that DHHS sought termination quickly, but respondent was given information to get a substance abuse assessment. In other words, while DHHS filed for termination quickly, it did not completely abandon the provision of services. Respondent failed to follow through with the recommended inpatient treatment and left the facility because she had issues getting along with the other residents and did not want to do assigned chores. In addition, Nesberg stated that respondent had received services through Pathway and Great Lakes Recovery for the case involving BL in 2016. Importantly, the current caseworker, Killips, testified, "[Respondent] shared with me that she previously participated in outpatient care with Great Lakes Recovery Services; but in her own words, it didn't work out."[17] Respondent had received services at a hospital psychiatric unit after a suicide attempt. This related to the substance abuse issue because there was testimony that respondent used drugs to cope with mental health issues. Respondent had received parent-aid services in connection with MR in 2012 and, in the hospital with IT, she was given instructions about caring for an infant. But despite this, the nursing staff had expressed concerns about respondent's ability to parent IT. As noted, Killips said that respondent "prioritized sleep over caring for [IT] as he laid [sic] crying next to her" and that respondent had "an overall lack of knowledge of providing care to a newborn baby." At the hospital, respondent was given a referral to Early On for IT but failed to follow through.

It is of particular significance that the tribal expert was in support of termination and concluded that respondent had received many active efforts since 2012. Nesberg stated that the tribe had "met and read through this case, and they are in support of termination of mother's

---

[17] Killips testified that she provided a booklet addressing available mental health services in the county as well as locations and times for substance abuse meetings. Killips further testified that she wanted respondent to be and do better despite the request for termination of her parental rights.

parental rights." The GAL concurred. In light of this, and in light of the testimony summarized above, we cannot conclude that the trial court clearly erred in its active efforts finding.[18]

Affirmed.

/s/ Elizabeth L. Gleicher
/s/ Kirsten Frank Kelly
/s/ Anica Letica

---

[18] Respondent does not make any substantive argument regarding best interests. See MCL 712A.19b(5) ("If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made."). At the best-interests hearing, more testimony was elicited regarding why it was inappropriate for IT to be placed with respondent. For example, respondent said that she was engaged to man who had issues with methamphetamine and that he was not an appropriate person to have around IT. But she said that she believed he could change to become appropriate. He was scheduled to be released from incarceration by September 2022. Respondent admitted that she was "not capable of taking care of [her] own money" and that her mother managed her money. When asked in what way she was bonded with IT, she merely said, "Waking up to him in the middle of the night at the hospital." When asked why she believed that she could provide a safe home for IT, respondent merely replied, "Because I got income." Nesberg stated that she had been informed that, multiple times while in the hospital with IT, respondent had asked nurses to care for IT while she played on her telephone, watched television, or otherwise relaxed. Nesberg asserted that, one night, IT was crying aggressively and respondent would not get up; the nurses came in to care for him and respondent said, "If you need me, let me know," and went to sleep. Although it is not being contested, the trial court's best interests finding was not clearly erroneous.