*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* SB.

FOR PUBLICATION
June 27, 2024
9:05 a.m.

AB,

       Petitioner-Appellee,

v

No. 367014
Clinton Circuit Court
Family Division

SB,

LC No. 2022-030774-PP

       Respondent-Appellant.

Before: CAMERON, P.J., and N. P. HOOD and YOUNG, JJ.

PER CURIAM.

Respondent, SB, appeals as of right the trial court's order finding him guilty of criminal contempt for violating a domestic personal protection order (PPO) concerning petitioner, AB. Respondent also appeals the court's order extending the duration of the PPO. We affirm both orders.

## I. BACKGROUND

At the time of these contempt proceedings, petitioner and respondent were married, but in the process of divorcing. They do not have children together. Petitioner initiated divorce proceedings in early August 2022, and she left the marital home later that month. At the time of the instant proceedings, the parties lived in different houses in the same subdivision on a circular

road. Respondent's house was located across the street and one house over from petitioner's house (the former marital home) [1]; they lived only 140 to 200 feet from each other.

In August 2022, petitioner filed a petition asking the trial court to issue an ex parte PPO against respondent under MCR 600.2950 (domestic PPO). Petitioner alleged numerous instances of improper conduct by respondent beginning in May 2022, when he allegedly screamed at her, falsely accused her of cheating, smashed holes in the walls, kicked a hole in a door, tore down window treatments, and destroyed bed sheets. She alleged various other threatening, violent, and harassing behavior by respondent in July and August 2022. Petitioner alleged that she feared respondent because he frequently used substances, stalked her, and was violent and unpredictable.

The trial court issued an ex parte PPO, prohibiting respondent from (1) "entering onto property where petitioner lives"; (2) "assaulting, attacking, beating, molesting, or wounding" petitioner; (3) "stalking[—]as defined under MCL 750.411h and MCL 750.411i[—]that includes but is not limited to . . . following petitioner or appearing within [her] sight," "sending mail or other communications to petitioner," and "approaching or confronting petitioner in a public place or on private property"; and (4) "interfering with petitioner at [her] place of employment or education or engaging in conduct that impairs [her] employment or educational relationship or environment." The PPO apprised respondent that violating the order would subject him to immediate arrest, to the criminal contempt powers of the court, and, if found guilty, to imprisonment for not more than 93 days and a fine of not more than $500. The PPO was immediately effective for six months, expiring on February 28, 2023.

In November 2022, petitioner filed a show-cause motion, seeking to hold respondent in contempt.[2] Petitioner alleged that respondent was "continuing to stalk me, asking others to relay messages to me, and interfering with my employment." After the parties agreed to extend the PPO an additional six months, the motion did not move forward. The trial court entered an amended PPO extending the expiration date to August 27, 2023, and prohibiting the same conduct.[3]

Relevant to this appeal, in March 2023, petitioner filed another show-cause motion, again seeking to hold respondent in criminal contempt for violating the PPO via continuing stalking and harassing behavior between November 2022 and March 2023. Petitioner filed a third show-cause

---

[1] The parties apparently owned both houses and had previously used respondent's house as a rental property. The record indicates that before these PPO proceedings began, the court in their divorce proceedings entered an ex parte order allowing petitioner "exclusive use" of the marital home.

[2] MCR 3.708(B)(1) permits a petitioner to file a motion to have a respondent who violates the PPO held in contempt.

[3] The amended PPO additionally prohibited respondent from "intentionally causing petitioner mental distress or exerting control over petitioner by: injuring, killing, torturing, or neglecting, or threatening to injure, kill, torture, or neglect any animal in which petitioner has an ownership interest," removing such animal from her possession, and "retaining or obtaining possession of" such animal.

motion in April 2023 seeking the same relief and alleging further harassment by respondent. Respondent was arraigned and pleaded not guilty to criminal contempt that same month.[4]

At the conclusion of a hearing, the trial court found respondent guilty of criminal contempt for violating the PPO. The court initially stated:

> So we have had our hearing on these allegations and *the burden of proof is beyond a reasonable doubt*. Now *in looking at each and every allegation individually all by themselves I don't believe a finding could be made. In looking at all of them together, the totality of the circumstances, that is what I'm going to do*. [Emphasis added.]

The court then provided its factual findings, beginning with petitioner's allegations involving surveillance equipment respondent installed facing her home:

> So we will start with the video cameras because that that is the first thing that I wrote down that was of concern to me. [Respondent] testified that there were not video cameras that were placed at the house that he [previously] lived at with [petitioner]. . . . [T]here were no surveillance cameras on that home and [respondent] chose to put surveillance cameras on the home that he lives in now. One of them is on the front of the garage and the other one is pointed directly at [petitioner's] house. . . . Her testimony I found quite compelling. Her demeanor I found to be compelling . . . [.] [S]he testified to the emotional distress that having those cameras, at least the one, pointed at her house caused her . . . because she was told and there's evidence of that in text messages that [respondent] could see in her home. I would suffice it to say that even if [respondent] couldn't see directly in her home, having a camera pointed directly at someone's home in this type of situation where there's clearly hostility at best, hostility between the two would be very harassing and very intimidating and does go against the order of the court[. A]nd I will bring our attention to the order of the court where [respondent] is prohibited from stalking as defined by MCL 750.411(H) and MCL 750.411(I), which states it includes but is not limited to and there were certain things that the court marked off. Now, no, I didn't put on here you're not allowed to put security cameras up. I didn't do that and I think that's why this order says it's including but not limited to. It is behavior that would cause a reasonable person to feel distressed[. And it would evoke] emotional distress to have a camera of [sic, on] someone where there's hostility[,] whether it's a soon to be ex-spouse or if it's a neighbor that

---

[4] Petitioner filed a fourth show-cause motion concerning an April 12, 2023 incident involving respondent that is not at issue, though is somewhat relevant, in this appeal. Specifically, the trial court adjourned a hearing concerning this incident because respondent was criminally charged with aggravated stalking of petitioner.

-3-

you're having conflict with. A reasonable person would feel intimidated and harassed by that . . . .

The court made additional findings concerning a window in respondent's garage, a sign reading "Ho Ho Ho" displayed in the car window of respondent's son, and golf balls allegedly hit into petitioner's yard:

> That takes me to the window that was placed in [respondent's] garage. . . . [I]t is very concerning, at best, to this court that a wall was cut into to put a window that specifically faces the house of someone [petitioner] that has a PPO on you [respondent]. By itself[,] could [this] rise to the level [of intimidation or harassment? N]o, but I think taking [this] in conjunction with other issues . . . , I absolutely find that as a method used to intimidate and to harass [petitioner]. In terms of the sign, . . . that was one of those things that could have likely been avoided and probably should have. . . . [I]s it a criminal offense to put a sign in your car[? I]t's not, but the sign went up on March 1st, put in a place not once but twice in a car and then also in the garage facing [petitioner's] house with the words ho, ho, ho. Golf balls in the yard, I don't know. I'm not using that as one of my . . . findings because I don't know. I'm not sure. There was testimony that there weren't golf balls before in the yard[,] then there was testimony that there was. I'm—I'm not sure but I will say that if golf balls are being hit into [petitioner's] yard then that would absolutely be a violation of the PPO.

The court also discussed allegations that respondent screamed at petitioner's therapy dog and called her a slut:

> Screaming at the dog, [petitioner's] therapy dog. . . . This dog is living with [petitioner] and if she's walking down the road and she has her dog and she's taking her dog for a walk and that person that has a PPO filed against them yells out to get the dog's attention, it absolutely goes towards intimidating and harassing [petitioner]. . . . Then we have the—the screaming slut[,] and I find this stuff to be extremely antagonistic, extremely harassing, intimidating. [Petitioner's] father testified and I found him to be very credible in his testimony. ["]I heard [respondent] say it. I know it was him. I know his voice.["] Of course [petitioner's father] knows [respondent's] voice. It was his son in law. He knows where it came from. . . . It's not necessary to stand outside and scream names at someone. I don't care that [respondent] didn't say [petitioner's name]. He said slut.

Lastly, the court made various findings concerning alleged electronic stalking and/or harassment by respondent:

> Then we talk about LinkedIn. No, there's nothing in here that says you're not allowed to look at people's profiles but I am familiar with LinkedIn and I know what happens[,] and when someone clicks on your page and someone starts reading your information, a notification goes to that person that says hey, so and so is

looking at your LinkedIn page. It seems to me if someone has a PPO against you, you don't go on their LinkedIn page. You don't go on any of their pages. You don't do that. That is stalking. That is continuous pattern of behavior where you're interfering in this person's daily life one way or another. The same with the Bible app comment. I absolutely believe that [respondent] knew that when he was putting that comment on that app that it would be directly related to [petitioner]. It's an app that they share together. They had used it together in the past[,] and [respondent] knows what he's doing. Again, by itself is it—is it all alone something that I can say is a violation of the PPO[? N]o. [But i]t's continuous behavior here. A continuous pattern of behavior.[5]

The trial court concluded as follows:

Those are eight things that I just went through of continuous behavior. A pattern of violating this personal protection order by way of intimidation and harassment that . . . a reasonable person would absolutely find to be intimidating and it would cause them emotional distress. I have—I have no doubts about that. . . . *I find that proof was made beyond a reasonable doubt* that [respondent] is guilty of criminal contempt by violating this personal protection order *after going through all of the items that I did and by the totality of the circumstances* showing a clear pattern, a clear continuous behavior of intimidat[ion] and harassment[.] [Emphasis added.]

The trial court sentenced respondent to serve 93 days in jail. Further, the trial court, on its own motion, extended the PPO, which was set to expire on August 27, 2023, until June 28, 2024.[6] This appeal followed.

## II. ANALYSIS

Respondent argues that the trial court abused its discretion and denied him due process of the law by applying an incorrect standard of proof to find him guilty of criminal contempt for violating the PPO. Respondent also argues that the trial court violated his due-process right to present a defense by prohibiting his son from testifying. Lastly, respondent argues that the trial court abused its discretion by extending the PPO on its own motion.

---

[5] The parties and other witnesses testified regarding an additional allegation that respondent harassed petitioner at a school swim meet they both attended. The trial court did not mention this swim-meet incident, and thus apparently did not rely on it.

[6] The record reveals that upon respondent's release from jail on September 13, 2023, petitioner filed another show-cause motion alleging that respondent violated the extended PPO. Specifically, petitioner alleged that respondent was using his son as a "surrogate" to stalk and intimidate her. Petitioner also alleged that respondent loudly swore at her friends in her driveway and made a false police report alleging that she had damaged his window.

## A.  STANDARDS OF REVIEW

This Court has set forth the following standards for reviewing a trial court's decision to hold a party in criminal contempt:

> We review a trial court's decision to hold a party in contempt for an abuse of discretion. The nature of the contempt order and whether the contempt statute permitted the sanctions imposed are questions of law that are reviewed de novo. When examining the sufficiency of the evidence to support a criminal-contempt finding following a bench trial, this Court views the evidence presented in a light most favorable to the prosecution to determine if the elements of the crime were proven beyond a reasonable doubt. Furthermore, the trial court's factual findings in a contempt proceeding are reviewed for clear error, and we must affirm if there is competent evidence to support them. We do not weigh the evidence or the credibility of the witnesses in determining whether there is competent evidence to support the findings. Circumstantial evidence and the reasonable inferences arising from that evidence can constitute satisfactory proof of the elements. [*In re JCB*, 336 Mich App 736, 747-748; 971 NW2d 705 (2021) (citations omitted).]

"An abuse of discretion occurs when the trial court's decision is outside the range of principled outcomes." *In re KJL*, 342 Mich App 283, 293; 995 NW2d 361 (2022) (quotation marks and citation omitted). "Clear error exists when this Court is left with the definite and firm conviction that a mistake was made." *In re Contempt of Henry*, 282 Mich App 656, 668; 765 NW2d 44 (2009).

This Court reviews a trial court's conclusions of law de novo. *Walters v Snyder*, 239 Mich App 453, 456; 608 NW2d 97 (2000). "Furthermore, where the trial court's factual findings may have been influenced by an incorrect view of the law, an appellate court's review of those findings is not limited to clear error." *Id*. "Whether a party has been afforded due process is a question of law, subject to review de novo." *In re Contempt of Henry*, 282 Mich App at 668.

This Court also reviews for an abuse of discretion a trial court's decision to exclude evidence. *People v Kevorkian*, 248 Mich App 373, 441; 639 NW2d 291 (2001). "Whether a defendant was denied his constitutional right to present a defense is a question of law" subject to review de novo. *People v King*, 297 Mich App 465, 472; 824 NW2d 258 (2012).

Finally, this Court reviews a trial court's decision to continue a PPO for an abuse of discretion. See *Hayford v Hayford*, 279 Mich App 324, 325-326, 329; 760 NW2d 503 (2008). As it concerns this issue, this Court reviews de novo the proper interpretation of a court rule. *Maki Estate v Coen*, 318 Mich App 532, 538; 899 NW2d 11 (2017). "The interpretation and application of a court rule is governed by the principles of statutory construction, commencing with an examination of the plain language of the court rule." *Id*. at 540 (quotation marks, citation, and alteration omitted).

> The goal in interpreting a statute is to give effect to the Legislature's intent, focusing first on the statute's plain language. When a statute's language is

unambiguous, the Legislature must have intended the meaning clearly expressed, and the statute must be enforced as written. In addition, we must give effect to every word, phrase, and clause in a statute and avoid an interpretation that renders nugatory or surplusage any part of a statute. [*Id.* (quotation marks and citations omitted).]

However, respondent never preserved his claims of error related to his son's testimony and the trial court's order extending the PPO. Concerning the former, the record shows that the trial court precluded the son from being present in the courtroom during the proceedings, but respondent never provided any argument for the son to testify apart from simply naming the son on his witness list.

Specifically, after the first day of the contempt hearing, the trial court entered an order stating, "In addition, the Court requested that the minor child of Respondent not be in the courtroom due to a letter that was provided by the child's biological mother . . . ."[7] At the beginning of the hearing's second day, the court reiterated that the son was not permitted to be present. Respondent's counsel noted that the son was listed as a witness "in our documents," but neither counsel nor respondent made any request or argument for the son to testify at that time. Indeed, counsel implied that they were deferring to the mother's preference for the time being because she and respondent shared joint legal custody over the son.

Thus, nothing in the record shows that respondent ever actually attempted to call his son as a witness at trial. More importantly, respondent never made any offer of proof regarding the son's testimony or raised the instant due-process objection to precluding the son's testimony. Because these steps were required to preserve his evidentiary and constitutional claims, respondent never preserved this issue for appeal. See MRE 103(a)(2) (to preserve a claim of error in the exclusion of evidence, a party must "inform[] the court of its substance by an offer of proof, unless the substance was apparent from the context"); *King*, 297 Mich App at 472 (a defendant preserves a constitutional claim by "presenting [it] to the trial court.").

Concerning the trial court's sua sponte order to extend the PPO, we acknowledge that "a party . . . need not preserve an objection to 'a finding or decision' made by the trial court, MCR 2.517(A)(7) or, at least under some circumstances, to other acts or omissions undertaken sua sponte by a court." *Glasker-Davis v Auvenshine*, 333 Mich App 222, 227-228; 964 NW2d 809 (2020), citing *In re Gach*, 315 Mich App 83, 97; 889 NW2d 707 (2016). Nevertheless, after the trial court extended the PPO on its own motion, it asked respondent's counsel, "Is there anything else that you need to put on the record with regards to today's hearings . . . ?" Counsel moved for bond pending appeal, which the trial court denied, but did not raise the issue of the propriety of the court's sua sponte extension of the PPO. Nor is there any indication in the record that respondent otherwise moved to modify or rescind the extended PPO. Accordingly, given respondent's opportunity but failure to raise any objection regarding the PPO's extension, we deem this issue forfeited and unpreserved. Cf *Glaker-Davis*, 333 Mich App at 228 ("The purpose of the appellate preservation requirements is to induce litigants to do what they can in the trial court to

---

[7] The letter from the mother is included in the lower court record and indicates that she objected to the son's presence in the courtroom as a witness or participant.

prevent error and eliminate its prejudice, or to create a record of the error and its prejudice. [The p]laintiff clearly did everything reasonable to bring this issue to the trial court's attention."] (quotation marks and citation omitted).

This Court reviews unpreserved issues in criminal proceedings[8] for plain error. *In re Contempt of Henry*, 282 Mich App at 666; see also *King*, 297 Mich App at 472 ("Appellate review of unpreserved constitutional claims is for plain error affecting the defendant's substantial rights."). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). To demonstrate error that affected substantial rights, a defendant must establish "prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. "Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *Id*. at 763-764 (quotation marks and citation omitted).

B. STANDARD OF PROOF AND FINDING OF CONTEMPT

Respondent contends the trial court abused its discretion and denied him due process of the law by applying an incorrect standard of proof to find him guilty of criminal contempt for violating the PPO. According to respondent, the court erred by finding him guilty under the totality of the circumstances where it also said it could not find him guilty beyond a reasonable doubt of any of the particular, individual allegations at issue. Stated differently, respondent argues that the trial court did not properly apply the "beyond a reasonable doubt" standard in finding him guilty of criminal contempt because it relied on the totality of the circumstances. We conclude that the trial court did not violate respondent's right to due process or otherwise abuse its discretion by considering the totality of the circumstances and determining that his conduct violated the PPO beyond a reasonable doubt.

"No person may be deprived of life, liberty, or property without due process of law." *In re Contempt of Henry*, 282 Mich App at 669, citing US Const, Am XIV, § 1; Const 1963, art 1, § 17. Thus, "criminal penalties may not be imposed upon an individual who was not afforded the protections that the Constitution requires in criminal proceedings." *Ferranti v Electrical Resources Co*, 330 Mich App 439, 448; 948 NW2d 596 (2019).

"A person who fails to comply with a domestic PPO issued under MCL 600.2950 is subject to the criminal-contempt powers of the trial court." *In re KJL*, 342 Mich App at 293, citing MCL 600.2950(23). "Criminal contempt is a quasi-crime because it is not intended to punish conduct proscribed as harmful by the general criminal laws, but rather is designed to serve the limited

---

[8] "Although criminal contempt is really only a 'quasi-crime,' criminal contempt proceedings encompass many of the same due process safeguards available to defendants charged with traditional crimes." *In re Auto Club Ins Ass'n*, 243 Mich App 697, 713; 624 NW2d 443 (2000), superseded by statute on other grounds as stated in *Porter v Porter*, 285 Mich App 450, 458-461; 776 NW2d 377 (2009).

purpose of vindicating the authority of the court." *In re LT*, 342 Mich App 126, 134; 992 NW2d 903 (2022) (quotation marks and citation omitted). "A criminal-contempt proceeding 'requires some, but not all, of the due process safeguards of an ordinary criminal trial . . . .' " *Id.*, quoting *In re Contempt of Dougherty*, 429 Mich 81, 91; 413 NW2d 392 (1987). "A party charged with criminal contempt is presumed innocent, enjoys the right against self-incrimination, and *the contempt must be proven beyond a reasonable doubt*." *Porter v Porter*, 285 Mich App 450, 456; 776 NW2d 377 (2009) (emphasis added). See also MCR 3.708(H)(3); *In re KJL*, 342 Mich App at 293. Thus, "[i]n order to find a defendant guilty of criminal contempt, a willful disregard or disobedience of a court order must be clearly and unequivocally shown and proven beyond a reasonable doubt." *In re LT*, 342 Mich App at 135 (quotation marks and citation omitted).

"A trial judge is presumed to know the law," including the applicable standard of proof. *Demski v Petlick*, 309 Mich App 404, 427; 873 NW2d 596 (2015) (quotation marks and citation omitted). Here, the trial court explicitly stated several times that petitioner bore the burden of proving criminal contempt beyond a reasonable doubt. Further, the court stated on the record, "I find that proof was made beyond a reasonable doubt that [respondent] is guilty of criminal contempt by violating this personal protection order . . . ." And the court's written order states, "By proof beyond a reasonable doubt, the respondent was found guilty of criminal contempt." Thus, the trial court was clearly aware that it was required to apply the beyond-a-reasonable-doubt standard. See MCR 3.708(H)(3); *In re KJL*, 342 Mich App at 293.

Respondent, however, refers this Court to the following statement from the trial court: "Now in looking at each and every allegation individually all by themselves I don't believe a finding could be made. In looking at all of them together, the totality of the circumstances, that is what I'm going to do." But immediately preceding that statement, the trial court said, "So we have had our hearing on these allegations and the burden of proof is beyond a reasonable doubt," again indicating its awareness of the proper standard of proof. The issue therefore becomes whether the trial court properly applied the "beyond a reasonable doubt" standard in finding respondent guilty of criminal contempt for violating the PPO.

"[A] party may be held in criminal contempt for violating the plain, written conditions delineated in [a] PPO." *In re JCB*, 336 Mich App at 738. The PPO issued against respondent expressly prohibited "stalking as defined under MCL 750.411h and MCL 750.411i, *that includes but is not limited to*:" "following petitioner or appearing within [her] sight," "sending mail or other communications to petitioner," and "approaching or confronting petitioner in a public place or on private property." (Emphasis added.) The PPO further prohibited respondent from "engaging in conduct that impairs [petitioner's] employment or educational relationship or environment." The PPO thus clearly "embodied" petitioner's "right to be left alone" by respondent. *In re KJL*, 342 Mich App at 300.[9]

---

[9] As discussed, the PPO also prohibited respondent from "entering onto property where petitioner lives"; from "assaulting, attacking, beating, molesting, or wounding" her; and from "intentionally causing petitioner mental distress or exerting control over petitioner" regarding certain conduct toward her animals. Although petitioner's allegation regarding respondent placing golf balls in

-9-

Again, the PPO here was premised on, among other things, stalking activity as defined by statute. "Stalking" is defined in MCL 750.411h(1)(e) and MCL 750.411i(1)(e)[10] as "a *willful course of conduct involving repeated or continuing harassment* of another individual that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested and that actually causes the victim to feel terrorized, frightened, intimidated, threatened, harassed, or molested." (Emphasis added.) "Harassment" is defined as "conduct directed toward a victim that *includes, but is not limited to, repeated or continuing unconsented contact* that would cause a reasonable individual to suffer emotional distress and that actually causes the victim to suffer emotional distress." MCL 750.411h(1)(e) (emphasis added).[11]

> "Unconsented contact" means any contact with another individual that is initiated or continued without that individual's consent or in disregard of that individual's expressed desire that the contact be avoided or discontinued. Unconsented contact includes, *but is not limited to*, any of the following:
>
> (*i*) Following or appearing within the sight of that individual.
>
> (*ii*) Approaching or confronting that individual in a public place or on private property.
>
> (*iii*) Appearing at that individual's workplace or residence.
>
> (*iv*) Entering onto or remaining on property owned, leased, or occupied by that individual.
>
> (*v*) Contacting that individual by telephone.
>
> (*vi*) Sending mail or electronic communications to that individual.
>
> (*vii*) Placing an object on, or delivering an object to, property owned, leased, or occupied by that individual. [MCL 750.411h(1)(f) (emphasis added).]

---

her front and back yard would constitute "entering onto property where petitioner lives," the trial court did not rely on that to find respondent in contempt. There are no other allegations at issue that respondent entered onto petitioner's property, physically assaulted petitioner, or exerted control over her dog by injuring or neglecting the dog, threatening to do so, or removing the dog from her possession.

[10] MCL 750.411h prohibits stalking, and MCL 750.411i prohibits aggravated stalking. The relevant definitions are the same.

[11] "[H]arassment is not limited to unconsented contact." *Berryman v Mackey*, 327 Mich App 711, 723; 935 NW2d 94 (2019).

"Course of conduct" is defined as "a pattern of conduct composed of a series of 2 or more separate noncontinuous acts evidencing a continuity of purpose." MCL 750.411h(1)(a). " 'Emotional distress' means significant mental suffering or distress that may, but does not necessarily, require medical or other professional treatment or counseling." MCL 750.411h(1)(c).

"Accordingly, under Michigan civil and criminal law, stalking constitutes a willful course of conduct whereby the victim of repeated or continuous harassment actually is, and a reasonable person would be, caused to feel terrorized, frightened, intimidated, threatened, harassed, or molested." *Nastal v Henderson & Assocs Investigations, Inc*, 471 Mich 712, 722; 691 NW2d 1 (2005). Stated differently, "stalking entails a course or pattern of conduct that involves continuing or repeated harassment arising out of separate noncontinuous acts . . . ." *In re PF*, 336 Mich App 118, 129; 969 NW2d 805 (2021). Further, "MCL 750.411h dictate[s] contemplation of all relevant present and past incidents arising between the parties." *In re PF*, 336 Mich App at 130. This Court's application of the stalking statute in *In re PF*, 336 Mich App at 129, in the context of issuing a PPO premised on stalking activity, is insightful:

> [T]he sixth incident could not be viewed in isolation or a vacuum; rather, the pattern of conduct between and involving the parties, including the first five incidents, had to be examined in its entirety. The earlier incidents could give explanation or context to the sixth incident by providing insight on intent, continuity of purpose, the reasonableness of beliefs, and states of mind or feelings relative to terror, fright, intimidation, threats, harassment, and molestation. . . . [S]talking entails a course or pattern of conduct that involves continuing or repeated harassment arising out of separate noncontinuous acts, MCL 750.411h(1), thereby justifying the issuance of a PPO to halt the ongoing conduct. Stated otherwise, multiple acts or a series of acts are necessarily required to issue a PPO based on stalking conduct, and any one of the acts can shed light on the other acts. One incident can change the dynamics and meaning of surrounding incidents.

This Court further noted as follows:

> For example, there could be three incidents between parties that outwardly appeared innocent, but then a fourth incident makes absolutely clear that the earlier incidents were not innocent and instead involved acts undertaken with a nefarious intent or purpose. Or the fourth incident, standing alone, could appear entirely innocent, but when the prior three incidents are considered in conjunction with the fourth incident, the fourth incident could be construed as entailing unlawful activity. [*Id*. at 129 n 5.]

In other words, the trial court "needs to have the ability to examine and consider the totality of the circumstances when ruling on a PPO petition." *Id*. at 130.

Given this authority, it was appropriate for the trial court to employ such an analysis when evaluating whether respondent violated the PPO by "*stalking as defined under MCL 750.411h and MCL 750.411i that includes but is not limited to*" (emphasis added), following petitioner or appearing within her sight, sending mail or other communications to her, or approaching or confronting her. That is, in determining whether respondent's conduct constituted "stalking,"

conduct plainly prohibited by the PPO, it was appropriate for the trial court to evaluate the combined effect of respondent's "repeated or continuing acts" to determine, beyond a reasonable doubt, whether they rose to the level of a "willful pattern of conduct involving repeated or continuing harassment" that "would cause a reasonable individual to feel terrorized, frightened, intimidated, threatened, harassed, or molested" and that actually caused petitioner to feel that way. MCL 750.411h(1)(e).

Respondent argues that while circuit courts "may consider the totality of the circumstances when determining whether or not to issue a PPO, Michigan law affords no such latitude to trial courts when determining whether or not a violation of an already extant PPO has taken place." We disagree.

In so arguing, respondent relies on this Court's holding in *In re JCB*, 336 Mich App at 738, that "a party may be held in criminal contempt for violating the plain, written conditions delineated in [a] PPO." In *In re JCB*, this Court concluded that it was not necessary for the petitioner "to demonstrate a pattern of action before seeking to hold the respondent in criminal contempt" for a PPO violation; instead, it was sufficient that the respondent committed a listed, prohibited act. *Id.* at 752. But this Court did not prohibit trial courts from considering the totality of the circumstances to determine, beyond a reasonable doubt, whether a respondent committed stalking in violation of a PPO, which necessarily requires evaluation of a respondent's course of conduct involving repeated or continuing harassment causing emotional distress.

This Court explained as follows:

[The R]espondent submits that to present sufficient evidence to support criminal contempt premised on a violation of the PPO, a petitioner must demonstrate *again* to the court a course of conduct and harassment causing emotional distress. Because [the] petitioner alleged "only the one instance of assault throughout all the hearings," [the] respondent claimed that there was insufficient evidence to support the criminal contempt. We disagree. [*In re JCB*, 336 Mich App at 750.]

The Court elaborated that although the contempt proceeding involved only a single allegation of assault in violation of the PPO at issue, "[the] petitioner need not allow repeated assaults to occur to obtain relief." *Id.* at 750-751. "Instead, when a PPO is premised on the stalking statute, MCL 750.411h, a course or pattern of conduct is examined, and therefore, all relevant present and past incidents arising between the parties is pertinent for consideration. Furthermore, the plain language of the PPO itself instructs on the next course of action." *Id.* at 751 (quotation marks and citation omitted). Observing that "[t]he PPO expressly stated that [the] respondent was prohibited from stalking as defined in MCL 750.411h and MCL 750.411[*l*]," including by "approaching or confronting the petitioner in a public place or on private property," the Court concluded as follows:

At the show-cause hearing, [the] petitioner testified that he was mowing the lawn . . . when he was suddenly punched and scratched by [the] respondent and his shirt was torn. . . . This conduct violated the court's PPO because it fell within the prohibition against approaching or confronting the petitioner in a public place or on private property. The issuance of the PPO plainly apprised [the] respondent that if he committed a listed prohibited act, he was subject to immediate arrest and civil

and criminal contempt. [The r]espondent's contention that [the] petitioner had to demonstrate a pattern of action before seeking to hold [the] respondent in criminal contempt is not supported by the language of the order. [*In re JCB*, 336 Mich App at 751-752 (quotation marks and footnote omitted).]

Thus, the Court in *In re JCB* concluded that a violation of a PPO's listed, prohibited act of stalking was sufficient to establish criminal contempt, without demonstrating a new pattern of continuing harassing conduct. But while there need not be a continuing pattern of action when a respondent violates a PPO's listed, prohibited act, this does not mean that the totality of the circumstances may not be considered in assessing whether conduct in question constitutes stalking. And here, unlike in *In re JCB*, the allegations do involve a continuing pattern of conduct under the stalking statutes. Again, the stalking statutes explicitly referenced in the PPO, MCL 750.411h and MCL 750.411i, prohibit a course or pattern of harassing conduct causing emotional distress. See also *In re KJL*, 342 Mich App at 300 ("while the contact, viewed in isolation, was not particularly alarming, this was not an isolated contact, as the trial court aptly observed, but instead was part of a lengthy series of unlawful conduct and contact by [the respondent] that caused ongoing harm to [the petitioner]"); *In re PF*, 336 Mich App at 130 ("[W]hen a PPO request is sought on the basis of stalking conduct, the stalking statute, MCL 750.411h, must be examined and it requires, as noted, a course or pattern of conduct. MCL 600.2950 and MCL 750.411h dictate contemplation of all relevant present and past incidents arising between the parties.").

Accordingly, in adjudicating criminal contempt for violating a PPO based in part on stalking allegations, it was not improper for the trial court to consider respondent's pattern of conduct from a totality-of-the-circumstances perspective in concluding that petitioner established, beyond a reasonable doubt, that respondent violated the PPO by stalking, or by otherwise engaging in conduct that impaired petitioner's environment. Such conduct was plainly prohibited by the PPO. To hold that respondent could not be held in contempt for his continued stalking activity because his acts might not fit neatly into the list of specifically prohibited activity, or might not be harassment if viewed in isolation, would run contrary to the PPO's plain language and caselaw governing the stalking statutes at issue. This would also nullify the purpose of a PPO to protect individuals "who are maliciously followed, harassed, or intimidated by stalkers." *Nastal*, 471 Mich at 721.

In sum, the trial court did not adjudicate respondent's guilt under an incorrect view of the law by assessing respondent's conduct from a totality-of-the-circumstances perspective. Nor did it otherwise err in finding, beyond a reasonable doubt and based on the totality of the circumstances, that respondent (1) continued to engage in a willful course of conduct involving repeated or continuing harassment of petitioner that would cause a reasonable person emotional distress, and did cause petitioner emotional distress, in violation of the PPO's prohibition of stalking, or (2) engaged in "a continuous pattern of . . . interfering in [petitioner's] daily life one way or another" in violation of the PPO's prohibition of engaging in conduct that impaired petitioner's environment. It was proper for the court to consider respondent's continued pattern of harassing and intimidating conduct toward petitioner, i.e., the totality of the circumstances, to establish that he violated the PPO, particularly where the PPO plainly prohibited such conduct. Therefore, the trial court did not violate respondent's right to due process or otherwise abuse its discretion by considering the totality of the circumstances and determining that his conduct violated the PPO beyond a reasonable doubt.

-13-

We also conclude that the evidence, viewed as a whole and in context, sufficed to establish beyond a reasonable doubt that respondent violated the PPO. Specifically, the combined effect of respondent's acts—including pointing a security camera directly at petitioner's house, installing a window that faced her house, yelling to her dog as she was walking on her street, yelling "slut" as she was entering her house, and displaying or orchestrating display of the "Ho Ho Ho" sign in the window of a car facing her house—along with petitioner's testimony regarding the continued harassment and the emotional distress caused,[12] sufficiently established that respondent violated the PPO's prohibitions on stalking or engaging in conduct that impaired petitioner's home environment.

Although the trial court noted that respondent's acts if viewed in isolation may not have constituted a violation of the PPO, which did not explicitly prohibit those specific acts, it was respondent's continuing pattern of harassing and intimidating conduct that violated the PPO's prohibitions. And although respondent does not challenge any of the trial court's particular factual findings, we conclude, deferring to the trial court's credibility determinations and viewing the evidence in the light most favorable to petitioner, that the court's findings were supported by the evidence. See *In re Contempt of Henry*, 282 Mich App at 668. Because sufficient evidence established beyond a reasonable doubt that respondent violated "the plain, written conditions delineated in the PPO," *In re JCB*, 336 Mich App at 738, either by his continued stalking conduct or by engaging in conduct that impaired petitioner's environment, the court properly held respondent in criminal contempt. Under these circumstances, we reiterate that the trial court did not violate respondent's due process rights or otherwise abuse its discretion by considering the totality of the circumstances and determining that his conduct violated the PPO beyond a reasonable doubt.[13]

---

[12] Petitioner testified that she did not feel safe in her home, was "scared every day in my house," felt uncomfortable walking around her neighborhood, was "anxious and depressed," and had difficulty sleeping.

[13] Notably, although the trial court relied on the continued pattern of harassment in finding that respondent violated the PPO, his conduct in waving his arms and yelling "slut" at petitioner from his porch arguably constituted "appearing within [petitioner's] sight" or "confronting" petitioner in violation of the PPO's specifically listed prohibited contact. See *In re JCB*, 336 Mich App at 750-752 (petitioner did not need to demonstrate a pattern of action before seeking to hold respondent in criminal contempt). This Court, however, has cautioned against "a literal application of the "appearing within sight" provision to prove criminal contempt where, as here, the petitioner and the respondent are neighbors and "[the] respondent could be deemed in violation by merely exiting his home and being viewed by [the] petitioner." *In re JCB*, 336 Mich App at 752 n 3. Nevertheless, this Court further noted that the petitioner in *In re JCB* "did not assert that [the] respondent's sole appearance was problematic, but rather, it was [the] respondent's presence, yelling, verbal abuse, and threats of violence." *Id.* Similarly here, it was not merely respondent's presence within the curtilage of his own residence that petitioner asserted violated the PPO, but also his screaming and obscenity directed at her.

-14-

## C. THE SON'S TESTIMONY

Respondent argues that the trial court violated his due-process right to present a defense by prohibiting his son from testifying. We conclude that respondent has not shown that the trial court committed plain, outcome-determinative error—as necessary to grant relief for this unpreserved claim—by precluding his son from testifying.

"The Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *King*, 297 Mich App at 473 (quotation marks and citations omitted). The due-process right to present a defense includes the right to call witnesses. *People v Yost*, 278 Mich App 341, 379; 749 NW2d 753 (2008). Accordingly, "the accused in a contempt proceeding is entitled to . . . produce witnesses on his or her behalf." *DeGeorge v Warheit*, 276 Mich App 587, 593; 741 NW2d 384 (2007). See also MCR 3.708(H)(2) (the respondent has the right to present evidence and to examine and cross-examine witnesses at a contempt hearing for a violation of a PPO). Thus, precluding a witness from testifying at a contempt hearing raises due-process concerns. See *DeGeorge*, 276 Mich App at 594.

"Although the right to present a defense is a fundamental element of due process, it is not an absolute right." *People v Hayes*, 421 Mich 271, 279; 364 NW2d 635 (1984). "The accused must still comply with 'established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence.' " *Id.*, quoting *Chambers v Mississippi*, 410 US 284, 302; 93 S Ct 1038; 35 L Ed 2d 297 (1973).

"The rules of evidence apply to a hearing on a contempt charge." *In re Contempt of Henry*, 282 Mich App at 670 n 1. Under MRE 402, "[a]ll relevant evidence is admissible unless the rules of evidence, or the United States or Michigan constitutions, provide otherwise." *In re Contempt of Henry*, 282 Mich App at 670 n 1. "Evidence is relevant if it has any tendency to make the existence of a fact that is of consequence to the action more probable or less probable than it would be without the evidence." *People v Aldrich*, 246 Mich App 101, 114; 631 NW2d 67 (2001), citing MRE 401. "Under this broad definition, evidence is admissible if it is helpful in throwing light on any material point." *Aldrich*, 246 Mich App at 114 (citation omitted).

"All witnesses are presumed to be competent to testify." *People v Watson*, 245 Mich App 572, 583; 629 NW2d 411 (2001). " 'Unless the court finds after questioning a person that the person does not have sufficient physical or mental capacity or sense of obligation to testify truthfully and understandably, every person is competent to be a witness except as otherwise provided in these rules.' " *Watson*, 245 Mich App at 583, quoting MRE 601. Thus, a minor—such as respondent's 16-year-old son here—is presumed competent to testify so long as he or she has sufficient capacity to do so truthfully and understandably.[14] This Court has found no impropriety in permitting a minor to testify. See *Surman v Surman*, 277 Mich App 287, 303-304; 745 NW2d 802 (2007) (11-year-old child competent to testify).

---

[14] There is no evidence that the trial court evaluated the competency of respondent's son to testify.

In *People v Miller*, 16 Mich App 647, 649; 168 NW2d 408 (1969), the defendant, who was convicted of the criminal sexual assault of his 13-year-old daughter, argued that neither parent consented to his 10-year old daughter's testifying. This Court rejected that argument, stating, "Although young children should not ordinarily be examined as witnesses to indecent matters, they are competent witnesses and there is no impropriety in asking them as to the social intimacy of the parties." *Id.*

In this case, the record indicates that respondent's son, who by all accounts was present when the "Ho Ho Ho" sign incident occurred, would have had first-hand knowledge of the circumstances surrounding it. Both parties testified that the sign was in the car that respondent's son usually drove, and that the son moved the vehicle and sign after petitioner called the police and they arrived. Respondent testified that the car was at the edge of the road merely because his son was playing basketball in the driveway, and that the sign was present because his son was cleaning his car. Therefore, respondent's son could likely provide relevant testimony on a material matter. Because respondent's son was presumed competent to testify, it would have been improper to preclude him from testifying solely on the basis that he was a minor, or because his mother expressed her preference that he not participate in the contempt proceedings.[15]

Nevertheless, as discussed earlier, the record does not show that respondent ever actually asked the trial court to allow his son to testify at the contempt hearing following the mother's desire that the son not participate. Respondent also never provided any offer of proof regarding the son's testimony, nor any objection to the purported exclusion. Accordingly, the trial court's alleged error in precluding the son from testifying is neither clear nor obvious from the existing record, i.e., respondent has not shown that the court committed plain error. See *Carines*, 460 Mich at 763. Regardless, assuming arguendo that the trial court did preclude respondent's son from testifying—a possibility considering the court's statements prohibiting the son's presence in the courtroom—and that it did so in error, respondent has not shown that the error was outcome-determinative. *Id.*

Respondent supports his argument as follows:

Upon information and belief, had [respondent's] son . . . been permitted to testify, he would have likely stated that his vehicle was at the end of the driveway because he had recently played basketball in the driveway and that the sign at issue was—among other items in his vehicle—located in his vehicle because he was in the process of cleaning out the truck (it was messy).

This purported testimony clearly corroborates respondent's version of the circumstances surrounding the sign, which likely would have bolstered his defense to that facet of the alleged harassment, as well as his credibility. However, there is no evidence, nor other indication in the record, that respondent's son would have actually testified in such a manner. Again, there is no indication in the record that respondent made an offer of proof before the trial court as to what his

---

[15] As discussed, it does not appear that the trial court ever specifically precluded the son from testifying, but the court did preclude the son's general presence in court based on the mother's letter objecting to the son's presence in the courtroom as a witness or participant.

-16-

son would testify to, or that his son's testimony would have been favorable to respondent. Nor did respondent present anything on appeal, such as an affidavit by his son, to attempt to establish that he would have testified in the manner respondent asserts. In short, there is no record support for respondent's contention that his son would have corroborated respondent's testimony regarding the sign incident.

Further, respondent testified in his own defense regarding the sign incident, and thus was not precluded from presenting a defense to that allegation. Notably, respondent does not assert in his brief on appeal that his son would testify that respondent did not place the sign in the window or direct the son to do so. And the trial court's contempt finding relied on several other acts of harassing conduct, making it unlikely that any error in precluding respondent's son from testifying about the circumstances surrounding the sign incident was outcome-determinative. See *Carines*, 460 Mich at 763.

For these reasons, respondent has not shown that the absence of his son's testimony affected the outcome of the contempt proceedings, or that he was denied his constitutional right to present his defense. Therefore, respondent has not established entitlement to appellate relief on this issue.

## D. EXTENSION OF PPO

Respondent argues that the trial court abused its discretion by extending the PPO on its own motion. We similarly conclude that respondent has not shown that the trial court committed plain, outcome-determinative error under this issue.

As an initial matter, we must address a potential jurisdictional defect related to this issue on appeal. See *Walsh v Taylor*, 263 Mich App 618, 622; 689 NW2d 506 (2004) ("The question of jurisdiction is always within the scope of this Court's review."); MCR 7.216(A)(10) (the Court of Appeals may, at any time, in its discretion, dismiss an appeal for lack of jurisdiction). This is because this appeal arises as of right, but respondent's challenge to the court's extension of the PPO is arguably only appealable by leave granted.

"The jurisdiction of the Court of Appeals is provided by law, and its practice and procedure are prescribed by the court rules and our Supreme Court." *Walsh*, 263 Mich App at 622. MCL 600.308(1) grants this Court "jurisdiction on appeals from all final judgments and final orders from the circuit court, court of claims, and probate court, as those terms are defined by law and supreme court rule . . . ." MCR 3.709(A) provides that, "[e]xcept as provided by this rule, appeals involving personal protection order matters must comply with subchapter 7.200." MCR 3.709(B) provides for an appeal from the entry of a PPO as follows:

(1) Either party has an appeal of right from

(a) an order granting or denying a personal protection order after a hearing under subrule 3.705(B)(6), or

(b) the ruling on respondent's first motion to rescind or modify the order if an ex parte order was entered.

(2)  Appeals of all other orders are by leave to appeal.

MCR 3.709(C) provides for an appeal from a finding after a violation hearing as follows:

(1) The respondent has an appeal of right from a sentence for criminal contempt entered after a contested hearing.

(2)  All other appeals concerning violation proceedings are by application for leave.

The trial court's order sentencing respondent to 93 days in jail is appealable as of right under MCR 3.709(C)(1), but the challenge to the order extending the PPO, entered after the contempt hearing, is arguably not an appeal from a sentence for criminal contempt coming under MCR 3.709(C)(1).  Nevertheless, as elaborated later within the substantive analysis of this issue, we construe the PPO's extension as part of the trial court's sentencing under MCR 3.708(H)(5).  Under this provision, "[i]n addition to such a sentence [for violating a PPO], the court may impose other conditions to the [PPO]."  The trial court here, in addition to entering its separate order extending the PPO, noted as follows on the criminal-contempt order sentencing respondent: "Other conditions: Extending the PPO dated 1/9/2023 to 8/27/2023 to 6/8/2024."  Because the court clearly contemplated the PPO's extension as a condition of its sentence, respondent's appeal of the extension is an appeal from respondent's sentence for criminal contempt entered after the contested hearing, which would then be by right.  See MCR 3.709(C)(1).

For these reasons, although an extension of a PPO by itself is normally only appealable by leave granted, the order imposed here as a condition of respondent's sentence is encompassed in the instant appeal as of right from this sentence.  Having determined that this Court has jurisdiction over this issue, we now turn to the merits.

Review of the lower-court record indicates that petitioner did not move the trial court to extend the PPO.  Instead, at the contempt hearing, after finding respondent guilty of criminal contempt for violating the PPO and sentencing him to serve 93 days in jail, the trial court proceeded to sua sponte extend the PPO, stating as follows:

[O]n the court's own motion, I'm going to extend this personal protection order, which has an expiration date of August 27th, 2023. . . . I'm going to extend it to June 28th, 2024. . . . I have filled out the order after hearing. . . . I'm not changing any terms or conditions on there. . . . I have filled out the order after today's hearing as well as a second order that states order on motion to modify, extend, or terminate, which is not what were [sic] here for today but it allows the opportunity for the court to enter that.  I have extended the expiration of the PPO to be on June 28th, 2024.

"Except as otherwise provided in MCL 600.2950 and MCL 600.2950a, an action for a PPO is governed by the Michigan Court Rules, with MCR 3.701 *et seq*., applying to PPOs against adults."  *Patterson v Beverwyk*, 320 Mich App 670, 682; 922 NW2d 904 (2017), citing MCR 3.701(A).  Here, both MCR 3.707(B)(1) and MCR 3.708(H)(5) are relevant to the trial court's authority to extend a PPO.  We address each in turn.

### 1. MCR 3.707(B)(1)

MCR 3.707(B)(1) states as follows:

> The petitioner may file an ex parte motion to extend the effectiveness of the [PPO], without hearing, by requesting a new expiration date. The motion must be filed with the court that issued the personal protection order no later than 3 days before the order is to expire. The court must act on the motion within 3 days after it is filed. Failure to timely file a motion to extend the effectiveness of the order does not preclude the petitioner from commencing a new personal protection action regarding the same respondent, as provided in MCR 3.703.

MCR 3.707(B)(1) thus plainly permits a petitioner to file a motion to extend a PPO, provides the process governing how and when a petitioner may do so, and specifies when the trial court must act on such a motion. Pertinent here, MCR 3.707(B)(1) does not explicitly provide the court with any authority to extend a PPO on its own initiative. Had the drafters intended that the rule permit a court to extend a PPO sua sponte, they could have explicitly said so. See *People v Comer*, 500 Mich 278, 296-297; 901 NW2d 553 (2017) (applying similar reasoning in construing MCR 6.429). Indeed, other court rules contain language permitting the trial court to act on its own initiative, "demonstrating that actions taken on the court's 'own initiative' are distinct from actions prompted by motions of any party." *Dawley v Hall*, 501 Mich 166, 171; 905 NW2d 863 (2018).[16]

---

[16] Our Supreme Court in *Dawley*, 520 Mich at 171 n 10, cited several court rules specifically authorizing the trial court to act "on its own initiative" in other contexts:

> See, e.g., MCR 2.612(A)(1) ("Clerical mistakes in judgments, orders, or other parts of the record and errors arising from oversight or omission may be corrected by the court at any time on its own initiative or on motion of a party and after notice, if the court orders it."); MCR 2.402(B) ("[a] court may, on its own initiative or on the written request of a party, direct that communication equipment be used"); MCR 2.316(B)(3) ("On motion of a party, or on its own initiative after notice and hearing, the court may order discovery materials removed at any other time on a finding that the materials are no longer necessary."); MCR 2.115(B) ("On motion by a party or on the court's own initiative, the court may strike" certain matters from a pleading); MCR 2.114(E) ("If a document is signed in violation of this rule, the court, on the motion of a party or on its own initiative, shall impose" reasonable expenses); MCR 2.207 ("Parties may be added or dropped by order of the court on motion of a party or on the court's own initiative . . . ."); MCR 2.509(A)(2) (requiring the court to hold a jury trial unless "the court on motion or on its own initiative finds that there is no right to trial by jury").

See also *Comer*, 500 Mich at 296 n 46.

In *Comer*, our Supreme Court construed the then-existing version of MCR 6.429 to determine whether it allowed a court to correct an invalid sentence on its own initiative, Subrule (A) of which provided that "[a] motion to correct an invalid sentence may be filed by either party. The court may correct an invalid sentence, but the court many not modify a valid sentence after it has been imposed except as provided by law." MCR 6.429(B) then sets forth time limitations for filing a motion to correct an invalid sentence. In construing the court rule's language to determine if it allowed the trial court to correct an invalid sentence sua sponte, the Court concluded that it did not:

> Had the drafters intended MCR 6.429 to allow sua sponte correction of substantive mistakes in a sentence after judgment is entered, we would have expected them to be more explicit. As a result, we believe MCR 6.429(A) is best read as requiring a party to file a timely motion before a court may correct an invalid sentence upon which judgment has already entered.

> Therefore, we conclude that MCR 6.429 authorizes either party to seek correction of an invalid sentence upon which judgment has entered, but the rule does not authorize a trial court to do so sua sponte. MCR 6.429(B) describes in detail the process for correcting an invalid sentence, which requires the motion of a party. Like MCR 6.429(A), Subrule (B) contains no indication that a trial court may act on its own initiative. To the contrary, the procedure and accompanying time limits set forth in MCR 6.429(B) would have little meaning if MCR 6.429 permitted trial courts to correct invalid sentences sua sponte at any time.[17] [*Comer*, 500 Mich at 296-297.]

Similarly, MCR 3.707(B)(1) contains no language permitting the trial court to extend a PPO on its own initiative, while providing for the procedure and time limits for *a petitioner* to move to extend the PPO. Thus, it appears that MCL 3.707(B)(1)'s drafters made a "meaningful choice" that a petitioner may initiate an extension of a PPO by motion, not the trial court. See

---

[17] Following the Court's decision in *Comer*, MCR 6.429(A) was amended, and currently provides as follows:

> The court may correct an invalid sentence, *on its own initiative* after giving the parties an opportunity to be heard, or on motion by either party. But the court may not modify a valid sentence after it has been imposed except as provided by law. Any correction of an invalid sentence on the court's own initiative must occur within 6 months of the entry of the judgment of conviction and sentence. [Emphasis added.]

The staff comment to the September 1, 2018 amendment of MCR 6.429(A) states that "[t]his amendment provides trial courts with authority to *sua sponte* address erroneous judgments of sentence, following the Court's recent consideration of the issue in *People v Comer*, 500 Mich 278 (2017)." 501 Mich at cclix-cclx (2018).

-20-

*Dawley*, 501 Mich at 171-172.  We therefore agree with respondent that the trial court lacked authority under MCR 3.707(B)(1) to extend the PPO sua sponte.[18]

### 2. MCR 3.708(H)(5)

MCR 3.708(H)(5) governs sentencing in criminal-contempt proceedings for violation of a PPO and provides as follows:

> Sentencing.
>
> (a) If the respondent pleads or is found guilty of criminal contempt, the court shall impose a sentence of incarceration for no more than 93 days and may impose a fine of not more than $500.00.
>
> * * *
>
> In addition to such a sentence, the court may impose other conditions to the personal protection order.

As discussed, it appears that the trial court acted under MCR 3.708(H)(5)'s power to impose other conditions when it extended the PPO, although the court did not specify the authority on which it relied.  The trial court stated, "I have filled out the order after today's hearing as well as a second order that states order on motion to modify, extend, or terminate, which is not what were [sic] here for today but it allows the opportunity for the court to enter that."  Further, in addition to entering its order extending the PPO on the basis that "[c]ircumstances continue to exist which would require extension/modification of the order," the trial court noted on its criminal-contempt order sentencing respondent: "Other conditions: Extending PPO dated 1/9/2023 to 8/27/2023 to 6/28/2024."

The question thus becomes whether the trial court had authority to extend the PPO sua sponte under MCR 3.708(H)(5).  As an initial matter, we are unaware of any Michigan caselaw addressing this question, nor does respondent direct this Court to any such caselaw.

Interpreting a court rule's plain language calls for "giving each word and phrase its common, ordinary meaning."  *Dawley*, 501 Mich at 169.  Again, MCR 3.708(H)(5) states in relevant part, "In addition to such a sentence, the court may impose other conditions to the personal protection order."  The use of the word "may" in the court rule indicates "permissive, discretionary activity."  *Haring Twp v City of Cadillac*, 290 Mich App 728, 749; 811 NW2d 74 (2010), aff'd 490 Mich 987 (2012).

---

[18] MCR 3.707(A), which governs modification or termination of a PPO, also does not contain any language permitting the trial court to modify or terminate a PPO on its own initiative. MCL 3.707(A) states that "[t]he petitioner may file a motion to modify or terminate the personal protection order and request a hearing at any time after the personal protection order is issued."

Respondent argues that the duration of a PPO is not a "condition" of the PPO, and the trial court therefore had no authority to extend the PPO under MCR 3.708(H)(5). The term "other conditions" is not defined in the court rules governing PPOs. "To ascertain the ordinary and generally accepted meaning of an undefined term, we may consult dictionary definitions." *People v Johnson*, 315 Mich App 163, 176; 889 NW2d 513 (2016). "When consulting a dictionary, this Court should be cognizant of the context in which the term is used." *Wardell*, 297 Mich App at 132. Accordingly, our analysis is limited to the dictionary definitions relevant in the context of MCR 3.708(H)(5).[19]

As a noun, "condition" is defined as "a premise upon which fulfillment of an agreement depends: STIPULATION"; "a provision making the effect of a legal instrument contingent upon an uncertain event"; "something essential to the appearance or occurrence of something else: PREREQUISITE"; or "a restricting or modifying factor: QUALIFICATION."[20] The word "other," used as an adjective, is defined as "not the same: DIFFERENT," or "ADDITIONAL."[21] Applying these definitions in the present context, MCR 3.708(H)(5) can be reasonably construed as granting the trial court discretion to impose different or additional stipulations, provisions, qualifications, or prerequisites to the PPO—i.e., to limit or expand the scope of the PPO—when sentencing a respondent for criminal contempt.

We now address whether the trial court's order extending the PPOs expiration date constitutes a different or additional stipulation, provision, qualification, or prerequisite to the PPO. We conclude it does.

As an initial matter, we acknowledge that "different provisions of a statute that relate to the same subject matter are *in pari materia* and must be read together as one law," *TCF Nat'l Bank v Dep't of Treasury*, 330 Mich App 596, 609; 950 NW2d 469 (2019), and that "when the Legislature uses different words, the words are *generally* intended to connote different meanings," *Honigman Miller Schwartz & Cohn LLP v Detroit*, 505 Mich 284, 317; 952 NW2d 358 (2020) (cleaned up) (*Honigman*). Accordingly, the different terminology used in MCR 3.707(B)(1) versus MCR 3.708(H)(5) arguably supports that an "exten[sion of] the effectiveness of the [PPO]" under MCR 3.707(B)(1) is wholly distinct from "other conditions to the [PPO]" under MCR

---

[19] For example, we need not discuss the definition of "condition" as "a usually defective state of health," Merriam-Webster.com Dictionary, *Condition* <https://www.merriam-webster.com/dictionary/condition> (accessed June 11, 2024), because this clearly is not applicable to a condition of a PPO related to sentencing.

[20] Merriam-Webster.com Dictionary, *Condition* <https://www.merriam-webster.com/dictionary/condition> (accessed June 11, 2024). The Black's Law Dictionary definition of "condition" is similar: "A future and uncertain event on which the existence or extent of an obligation or liability depends; an uncertain act or event that triggers or negates a duty to render a promised performance." *Black's Law Dictionary* (11th ed), p 366.

[21] Merriam-Webster.com Dictionary, *Other* <https://www.merriam-webster.com/dictionary/other> (accessed June 11, 2024).

3.708(H)(5). If so, respondent would be correct that the duration of a PPO is not a "condition" of the PPO, and the trial court therefore had no authority to extend the PPO under MCR 3.708(H)(5).

Nevertheless, such a conclusion requires construing these phrases not only as having different meanings, but also as encompassing mutually exclusive circumstances. Reading the plain language of these provisions in context, we reject this premise and conclude that "other conditions" under MCR 3.708(H)(5) do indeed include modifications to a PPO's expiration date. See *Honigman*, 505 Mich at 318-319 ("[D]espite the Legislature's use of the distinctive terms 'performed' and 'rendered,' we believe these terms should be understood as having similar meanings within the statute. . . . To be clear, we do not conclude the two terms possess identical meanings, just as we do not conclude they possess entirely distinctive meanings. Rather, we conclude the terms are similarly defined . . . but nonetheless each is to be given a *distinctive connotation from the distinctive context in which each is situated* within the statute.") (emphasis added).

First, other conditions is a general term capable of encompassing various circumstances, including modifications to a PPO's expiration date, whereas extending the effectiveness of the PPO plainly relates only to that specific action. Further, and most importantly, MCR 3.707(B)(1) and MCR 3.708(H)(5) relate to modifications of a PPO under wholly distinct procedural circumstances. The former requires a motion from the petitioner at any time three or more days before a PPO expires and, as mentioned, is explicitly limited to extending a PPO's effectiveness. The latter, in contrast, grants the trial court discretionary authority to impose other conditions to a PPO in connection with its sentence only after a respondent is convicted of criminal contempt. And in our view, it is appropriate for the trial court to determine when sentencing a respondent for criminal contempt for violating a PPO what, if any, additional conditions are warranted to adequately protect the petitioner going forward. As explained further in the next paragraph, this includes the authority to extend a PPO's effectiveness.

Consistent with this reasoning, a PPO's duration restricts, qualifies, or limits its effectiveness to a certain time period. It is an essential term because a PPO must be in effect to afford protection to its petitioner from certain prohibited conduct by the restrained individual, or conversely, for the restrained individual to be held in contempt for engaging in conduct prohibited by the PPO. See MCL 600.2950(11)(c) (a PPO must contain "[a]n expiration date stated clearly on the face of the order"); MCL 600.2950(9) (a PPO "is effective and immediately enforceable . . . after being signed by a judge"); MCL 600.2950(21) (a PPO "is immediately enforceable anywhere in this state by any law enforcement agency"); MCL 600.2950(23) (an individual who fails to comply with a PPO is subject to the court's criminal contempt power). Accordingly, the dates specifying when a PPO is in effect constitute a "condition"—i.e., a stipulation, provision, prerequisite, or qualification—to the PPO. And a change to or extension of a PPO's expiration date is thus an "other condition"—i.e., a different stipulation, provision, prerequisite, or qualification—to the PPO that the trial court may impose at sentencing under MCR 3.708(H)(5). Construing MCR 3.708(H)(5) as permitting the trial court to extend the PPO at sentencing is reasonable because the respondent's guilt has been established, and the trial court has been fully apprised of the situation between the parties such that it can readily evaluate the need to impose "other conditions" to the PPO, such as, in this case, extending its expiration date.

We disagree with respondent's additional argument that "if the extension of a PPO's duration were constructively consistent with a modification of its conditions, it would result in the Michigan Court Rule's separate treatment of order extensions [as] surplusage, which is prohibited by our cannons of statutory and court rule construction . . . ." As noted, MCR 3.707(A) permits a petitioner to file a motion to modify or terminate a PPO and request a hearing at any time after a PPO is issued and, upon such a motion, requires the trial court to conduct a hearing. And MCR 3.707(B) permits a petitioner to file an ex parte motion to extend the effectiveness of the PPO without a hearing. The drafters thus have plainly indicated their preference to permit the trial court to modify or terminate a PPO upon a petitioner's motion and after conducting a hearing on the matter, while also permitting the court to extend a PPO upon a petitioner's ex parte motion and without a hearing.

These provisions certainly reflect differing procedural requirements—a modification is permitted upon a petitioner's motion after a hearing, while an extension is permitted upon a petitioner's ex parte motion without a hearing. Contrary to respondent's argument, however, this does not mean that an extension is not a modification to a PPO. Rather, a reasonable construction of MCR 3.707 is that an extension is a particular modification that may be effectuated in a different manner, i.e., upon an ex parte motion and without a hearing.

Further contrary to respondent's argument, this does not mean that a PPO's duration is not an "other condition" to the PPO that the trial court may impose in addition to a sentence for criminal contempt under MCR 3.708(H)(5). Again, under MCL 3.708(H)(5), once a respondent is adjudged guilty of criminal contempt for violating the PPO, the trial court "may impose other conditions to the personal protection order." As discussed, a PPO's duration is one such "condition" to the PPO. Therefore, contrary to respondent's argument, permitting the trial court to extend the PPO at sentencing under MCL 3.708(H)(5) does not render "Michigan's Court Rule's separate treatment of order extensions [under MCL 3.707(B),] surplusage." Instead, as discussed, MCR 3.708(H)(5) can be reasonably construed as permitting the trial court to modify or extend the PPO sua sponte under its authority to impose "other conditions" *as part of sentencing in connection with a violation of the PPO*. In contrast, the other court rules relate to modifications of a PPO under wholly distinct procedural circumstances.

For these reasons, the trial court did not plainly err by extending the duration of the PPO on its own motion, specifically as a condition of sentencing after finding respondent guilty of criminal contempt for violating the PPO. And even assuming the trial court did plainly err by sua sponte extending the PPO's duration, respondent has not shown how that affected his substantial rights, i.e., any outcome-determinative error. See *Carines*, 460 Mich at 763.

When the trial court held respondent in criminal contempt for violating the PPO and sentenced him to serve 93 days in jail, the PPO was set to expire only two months later, one month before respondent's scheduled release from jail. The record reveals that when the court convicted respondent of criminal contempt, respondent had also been criminally charged with aggravated stalking related to the most recent alleged PPO violation in April 2023 not specifically at issue here. And the parties were in the process of an apparently acrimonious divorce in the family court.

Critically, respondent has not demonstrated any likelihood that he would have been able to avoid extension of the PPO if petitioner had filed an ex parte motion to extend it under

MCR 3.707(B), which he asserts was required.[22]  Rather, the circumstances presented at the time of the contempt hearing likely warranted an extension, given that respondent was found guilty of criminal contempt for his continued stalking conduct related to the March 2023 and April 4, 2023 show-cause petitions, he was facing criminal charges stemming from additional stalking conduct on April 12, 2023, and the PPO would otherwise expire less than one month before his release from jail.[23]  Respondent does not present any argument that the circumstances did not warrant an extension of the PPO, or that he was prejudiced by the extension; he argues only that the trial court did not follow the appropriate procedure when it sua sponte extended the PPO.[24]  Accordingly, on this record, respondent has not established that the court's sua sponte extension of the PPO constituted plain error that affected his substantial rights, and he is not entitled to appellate relief.

Affirmed.

/s/ Thomas C. Cameron
/s/ Noah P. Hood

---

[22] We note that because MCR 3.707(B) allows extensions to a PPO without a hearing and does not require that the respondent be provided notice or an opportunity to respond, any surprise from the trial court's improper extension of the PPO on its own motion here would not amount to error affecting respondent's substantial rights.  Specifically, the proper procedure for extending a PPO's effectiveness under MCR 3.707(B) does not provide any due-process requirements that were absent here, even if the court did not have authority under our court rules to address this matter sua sponte.

[23] Notably, under MCR 2.601(A), "every final judgment may grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded that relief in his or her pleadings."  See also *Arabo v Mich Gaming Control Bd*, 310 Mich App 370, 395; 872 NW2d 223 (2015) (concluding that trial court's entry of equitable relief was not unwarranted even though the plaintiff "did not expressly request entry of an injunction or a declaratory order").  We find this case analogous to such circumstances where the trial court entered relief that, while never requested by any party, was nevertheless warranted.

[24] Even if the trial court erred in extending the PPO on its own motion, respondent was nonetheless obligated to abide by its terms.  See *In re Contempt of Henry*, 282 Mich App at 680 ("[a] party must obey an order of a court with jurisdiction even if the order is clearly incorrect").  As earlier noted, petitioner alleged that after respondent's release from jail, he again began engaging in stalking behavior in early October 2023.